# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OTIS MICHAEL THOMAS,
            *Plaintiff-Appellant,*

v.

G. PONDER; M. J. KIRCHER; M. S.
EVANS,
            *Defendants-Appellees.*

No. 09-15522

D.C. No.
3:06-cv-03581-
MMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, Senior United States District
Judge, Presiding

Argued and Submitted
April 7, 2010—Pasadena, California

Filed July 16, 2010

Before: Daniel M. Friedman,* Dorothy W. Nelson, and
Stephen Reinhardt, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Friedman

---

*The Honorable Daniel M. Friedman, United States Circuit Judge for
the Federal Circuit, sitting by designation.

10285

## COUNSEL

Jeremy Maltby and Jonathan Wells Monson (argued), O'Melveny & Myers, LLP, Los Angeles, California; Rebecca S. Hekman (argued), UCLA School of Law Ninth Circuit Clinic, Los Angeles, California, for the plaintiff-appellant.

Edmund G. Brown, Jr., Rochelle C. East, Thomas S. Patterson, Neah Huynh (argued), Office of the California Attorney General, San Francisco, California, for the defendants-appellees.

## OPINION

REINHARDT, United States Circuit Judge:

Otis Thomas brought this suit seeking to establish that prison officials (individually and collectively "prison officials") violated his Eighth Amendment rights by denying him outdoor exercise for 13 months and 25 days while he was in a maximum security housing unit. The prison officials conditioned Thomas's access to outdoor exercise upon his signing a "pledge form" promising that he would not engage in violence while participating in prison programs. Thomas signed contemporaneous interview forms promising to "program non-violently" but refused to sign the pledge form itself. The prison officials insisted that only the pledge form would do and continued to refuse to allow him any opportunity to exercise until he signed the form.

The district court granted summary judgment for the prison officials on Thomas's 42 U.S.C. § 1983 claim. It concluded that the denial of out-of-cell exercise for such an extended period of time was "sufficiently serious" to constitute a valid Eighth Amendment claim, but held that Thomas failed to demonstrate that there was a genuine issue of material fact as

to whether the prison officials had acted with "deliberate indifference." First, it concluded that Thomas had failed to show that the prison officials believed that the risk of harm to Thomas's health was other than "insubstantial or nonexistent." Second, it concluded that there was insufficient evidence to establish that the prison officials acted unreasonably. The district court concluded that the prison officials' deprivation of Thomas's right to exercise was reasonable because of Thomas's disciplinary history and the "genuine emergency" at the prison, and because Thomas had the opportunity to sign the pledge form at any time, and upon signing would have been permitted to exercise out-of-cell.

We agree with the district court's conclusion that the prison officials' denial of out-of-cell exercise for such an extended period of time was "sufficiently serious" to constitute a valid Eighth Amendment claim, but reject the district court's other rulings. We hold that as a matter of law the serious risk to Thomas's health posed by this extended deprivation of a basic human necessity was "obvious" to the prison officials. We also hold that a material factual issue exists as to whether the prison officials' actions were reasonable, in light of Thomas's limited disciplinary record, the security conditions at the prison for the last 11 of the 14 months that Thomas was deprived of exercise, and the prison officials' willingness to allow Thomas to resume the regular course of exercise upon signing the formal pledge form. We therefore reverse the district court and remand for further proceedings.

## I. BACKGROUND

## A. FACTUAL BACKGROUND

Otis Thomas ("Thomas") was a prisoner housed in Facility C at the Salinas Valley State Prison ("SVSP") in 2005-06. Facility C is a level IV maximum security housing unit with the SVSP. Inmates are housed in Facility C for a variety of reasons, including "a history of assaultive behavior and disci-

plinary actions, gang-related convictions, and lengthy or life sentences." On July 14, 2005, a Facility C inmate using a homemade knife stabbed and seriously wounded two correctional officers.[1] In response, the prison officials placed the SVSP on lockdown from July 14, 2005 to September 9, 2005.[2] On September 9, 2005, prison officials introduced a "modified program" allowing "non-contact visits only, suspended quarterly packages and curtailed outdoor recreation." Under this modified program, prisoners were deprived of all out-of-cell exercise, fed in their cells, subjected to strip searches, and, on the rare occasions that they were permitted to leave their cells, were escorted in restraints.

On October 17, 2005, the Captain of Facility C, G. Ponder, sent a memorandum to the Facility C inmates that explained what they would be required to do in order to return from the "modified" program to a "normal" program. The memorandum stated, in relevant part:

> I am developing a process to help the facility work towards providing inmates that want to program without violence an opportunity to do so. The choice to program will be in the hands of each individual inmate. The first step in this process will be interviews. The next step will be your commitment to program without violence and verification of this commitment by signing that fact. The next process will involve Correctional Officers identifying inmates that have shown willingness to program and providing a list of those inmates to supervisory staff.

---

[1]Thomas was not involved with this incident, or with any other incident during this time period.

[2]"Lockdown" occurs when prison officials suspend activities and privileges for a portion of the prison's population and "all but essential functions are suspended in those affected housing units or sub-facilities, e.g., yard, canteen draws, religious services, and visiting." 15 Cal. Admin. Code § 3000.

> Inmates that fail to act in accordance with Depart-
> mental rules and Institution procedures will result in
> housing and program changes. Inmates are advised
> that their privileges and access to programs will be
> curtailed until you as an individual successfully
> comply with this process.

Ponder's program involved interviewing each inmate at least
twice. At each interview, the interviewee was required to sign
a "pledge" that he was willing to follow the proposed program
without violence. Inmates whom the prison deemed "willing
to program without violence" were typically returned to "nor-
mal" programming after their initial interview or signing of
the pledge form. Ponder explained, in a sworn declaration,
that once an inmate signed the pledge his return to normal
programing was also dependent upon prison officials under-
taking a review of his case to affirm that "no other factors evi-
dence a propensity for violence." Inmates who refused to sign
the pledge, declined interviews, or were otherwise deemed to
have not participated "meaningfully" in the interview process
remained on "modified" program status.

In accordance with this review policy, prison officials inter-
viewed Thomas several times between August 2005 and June
2006. Before beginning these interviews, prison officials
instructed Thomas to fill out forms. Thomas answered all of
the questions on these interview forms and then he and a
prison official signed all of the forms. The interview forms
were all identical and all included the following statement and
question: "Programming on a level IV general population
yard requires participation without violence. Are you willing
to commit to this type of program? If no, give details?" In
response to this question Thomas wrote "Yes." Another ques-
tion was "Do you have any safety concerns?" to which
Thomas answered "No." The question "If the facility were
returned to normal program, could you program without vio-
lence on a level IV general population yard with inmates from
all races/ethnics [sic] or past or present gang affiliations?"

also appeared on each form, and in response to this question Thomas also answered "Yes."

After Thomas signed the forms, prison officials conducted the interviews. During the interviews, prison officials gave Thomas a pledge form and instructed him to sign. The pledge form stated:

> I am currently housed within Facility 'C' Salinas Valley State Prison. I am also aware that this facility is on a modified program status based upon several acts of violence having occurred within the past 15 months.
>
> By signing this document, I am advising staff that I want to participate in the program review process being implemented at this time. I am also stipulating that I want to "do my own time" and will program by not participating in gang violence.
>
> I have been advised that my failure to act in accordance with institutional rules and procedures may result in program and housing changes. I am aware that during the time I participate in the program review process, I will retain my established work/privilege group.
>
> I am aware, if I am unassigned and I participate in the program review process that my participation does not constitute a credit earning assignment. Further, I understand that my privileges and access to programs will be curtailed until I successfully complete this program and am returned to normal general population program status.
>
> I have been advised that the program review process is ongoing and that I will be expected to maintain compliance with regulations to participate. During

the program review process I will be required to interact with other inmates of all races and ethnicity during all out of cell activities. The process and my participation in it, is on-going and monitored. [sic] During this period I understood that my progress and suitability to remain in the program will be monitored and evaluated by staff.

Thomas was later unable to recall whether he was asked to sign the pledge form at every interview, but he stated that on each occasion that he was asked to sign, he refused to do so.[3] The prison refused to release Thomas from the modified program and continued to deny him access to the outdoor exercise yard, because he would not sign the pledge. A Correctional Lieutenant in Facility C, Lieutenant J. Celaya, subsequently explained that, because Thomas refused to sign the pledge, he "posed an unknown risk and threat to prison staff . . . ." Celaya also stated that Thomas "had prior disciplinary problems, and was suspected of gang involvement." Celaya conceded, however, that Thomas's alleged gang involvement was an unsubstantiated assumption. Moreover, four other prisoners provided sworn declarations that the prison had returned them to normal programming even though they had never signed the pledge form.

---

[3]Thomas's reasons for refusing to sign the form are not immediately evident from the record. Thomas has offered various explanations for his refusal to sign. At one point, he stated that he refused to sign because he believed that the pledge would provide for "endless punishment" or "unspecified discipline" and would be used to force him to answer "questions about other inmates," when he was unwilling to do so. In his brief, Thomas further explained that he:

  did not object to pledging non-violence; rather, he believed that California regulations did not allow the prison to deny inmates exercise or other privileges for failing to sign such a "general chrono" form, and was concerned that, by signing the form, he might subject himself to discipline for an incident in which he had no involvement.

Thomas finally relented and signed the pledge form on August 31, 2006, at which juncture the prison officials released him from the modified program and restored his exercise privileges.[4] Thomas testified that he signed the pledge because he was tired, severely stressed, and losing weight. Prior to his singing the pledge, the prison officials had denied Thomas outdoor exercise for a total of 13 months and 25 days.

## B.   PROCEDURAL BACKGROUND

On June 5, 2006, while incarcerated at Centinela State Prison in California, Thomas filed a 42 U.S.C. § 1983 action against SVSP prison officials. Thomas amended this complaint on July 5, 2006. In his amended complaint Thomas alleged, *inter alia*, that prison officials Captain Ponder, Officer Kircher, and Warden Evans violated his Eighth Amendment rights by denying him access to the exercise yard for almost 14 months. None of the other allegations in his amended complaint is before us on this appeal.

The prison officials filed a motion for summary judgment on Thomas' Eighth Amendment claim and the district court granted the motion. It stated that it recognized that "[e]xercise is one of the most basic human necessities protected by the Eighth Amendment" and that Thomas had shown that his deprivation was sufficiently serious for a valid Eighth Amendment claim. It concluded, however, that for two reasons Thomas had failed to show that the prison officials acted with "deliberate indifference," an essential element of an Eighth Amendment claim. First, it concluded that Thomas could not show that the prison officials were "subjectively aware" of the risk to Thomas's health posed by the extended deprivation of exercise because "the undisputed evidence shows they believed the risk of harm to [Thomas] was insub-

---

[4]Thomas asserts that this was the second time he signed a pledge form. The first time was July 26, 2006.

stantial or nonexistent' because [he] could have signed the pledge at any time and gained immediate access to outdoor exercise." Second, it concluded that by keeping Thomas in the modified program, and denying him outdoor exercise, the prison officials had acted "reasonably," because:

> (1) Facility C was placed on lockdown and then modified program in response to a "genuine emergency," (2) there was a rational connection between requiring inmates to sign the CDC-128-B pledge and restoring institutional security, (3) plaintiff repeatedly refused to sign the pledge, (4) plaintiff had a lengthy discipline history, which included refusing to obey staff orders and threatening staff and other inmates, and (5) as a result of plaintiff's refusal to sign the pledge and his disciplinary history, defendants were unable to assess the level of threat plaintiff posed to staff and other inmates should he be returned to a normal program. Further, . . . almost a year after the July 14, 2005 stabbing incident, through June 2006, there were several other documented threats and assaults that took place at SVSP and in Facility C that threatened the safety and security of the institution and hindered the ability of staff to return to Facility C to normal programming.

Thomas timely appeals the summary judgment order as to his Eighth Amendment claim.

## II. ANALYSIS

We review *de novo* a district court's grant of summary judgment. *McDonald v. Sun Oil Co.*, 548 F.3d 774, 778 (9th Cir. 2008). The non-moving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [his] favor . . . . [his] version of any disputed issue of fact is thus presumed correct." *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 456 (1992) (internal quotation

marks omitted). At this stage of proceedings, we do "not weigh the evidence or determine the truth of the matter [asserted], but only determine[ ] whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc). "We will not reverse a district court's grant of summary judgment unless the party opposing summary judgment has identified the evidence establishing a genuine issue of material fact in its opposition to summary judgment." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009). An issue of material fact is genuine "if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

We construe liberally the filings and motions of a *pro se* inmate in a civil suit. *Bias v. Moynihan*, 508 F.3d 1212 (9th Cir. 2007) holds that an ordinary *pro se* litigant, like other litigants, must comply strictly with the summary judgment rules. *Id.* at 1219 (citing *Jacobsen v. Filler*, 790 F.2d 1362 (9th Cir. 1986)). *Pro se* inmates are, however, expressly exempted from this rule:

> It is the element of "choice" which most clearly distinguishes *pro se* prisoner cases from [ordinary *pro se* cases] . . . . an inmate's choice of self-representation is less than voluntary; and, when that unwilling self-representation is coupled with the further obstacles placed in a prisoner's path by his incarceration—for example his limited access to legal materials and to sources of proof—it seems appropriate to apply the requirements of the summary judgment rule with less than strict literalness.

*Jacobsen*, 790 F.2d at 1365 n.4 (internal citations and quotation marks omitted). We have, therefore, held consistently that courts should construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly. *See also Frost v. Symington*, 197

F.3d 348, 352 (9th Cir. 1999). Liberal construction is thus the appropriate standard to apply to Thomas's filings in this case.

## A.　The district court's ruling that there was insufficient evidence to establish that the prison officials knew of a serious risk of substantial harm to Thomas's mental and physical health is incorrect as a matter of law

[1] Under *Foster v. Runnels*, 554 F.3d 807 (9th Cir. 2009), an inmate seeking to prove an Eighth Amendment violation must "objectively show that he was deprived of something 'sufficiently serious,' " and "make a subjective showing that the deprivation occurred with deliberate indifference to the inmate's health or safety." *Id.* at 812 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The second step, showing "deliberate indifference," involves a two part inquiry. First, the inmate must show that the prison officials were aware of a "substantial risk of serious harm" to an inmate's health or safety.[5] *Farmer*, 511 U.S. at 837. This part of our inquiry may be satisfied if the inmate shows that the risk posed by the deprivation is obvious. *See id.* at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk [to a prisoner's health] from the very fact that the risk was obvious."). Second, the inmate must show that the prison officials had no "reasonable" justification for the deprivation, in spite of that risk.[6] *See id.* at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably.").

---

[5]In its order, the district court erroneously considers whether the prison officials were aware that Thomas was "suffering serious harm from the deprivation" of exercise. The correct issue for consideration is, however, whether the prison officials were subjectively aware of a "serious *risk* of substantial harm." *Farmer*, 511 U.S. at 837 (emphasis added); *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (emphasis added) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition.").

[6]We discuss the "reasonableness" arguments *infra*.

**[2]** The district court concluded correctly that the prison officials' denial of out-of-cell exercise to Thomas for 13 months and 25 days was "sufficiently serious" to constitute a valid claim under the Eighth Amendment. As the Supreme Court noted in *Wilson v. Seiter*, 501 U.S. 294 (1991), prison officials may violate an inmate's Eighth Amendment rights when they deprive him of "a single identifiable human need such as food, warmth, or exercise." *Id.* at 304. Here, as the district court noted, Thomas satisfies *Foster* and *Farmer*'s objective test based on the undisputed fact that he was denied outdoor exercise for the 13 months and 25 days. We have held consistently that "ordinarily the lack of outside exercise for extended periods is a sufficiently serious deprivation" for Eighth Amendment purposes. *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993). A prohibition on outdoor exercise of six weeks is a "sufficiently serious" deprivation to support an Eighth Amendment claim. *See, e.g.*, *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (en banc); *Allen v. Sakai*, 48 F.3d 1082, 1086 (9th Cir. 1994).

After determining that an individual has shown objectively that he was deprived of something "sufficiently serious," we must next consider whether the risk to the inmate was sufficiently "obvious" to the prison officials that they must have been aware of the severity of the deprivation, before we move on to consider whether the deprivation was nonetheless reasonable in light of all of the circumstances. The district court appears, however, not to have considered whether the risk to Thomas's health was "obvious," but instead determined that it was "insubstantial or nonexistent," because (i) Thomas could have signed the form at any time, and (ii) Thomas had a "substantial" disciplinary history and security conditions at the prison were "acute." In so doing, it bypassed a necessary step in its inquiry, and proceeded instead directly to the question of reasonableness. We therefore turn, in the first instance, to the question that the district court erroneously omitted: whether the risk to Thomas's health was "obvious" to the prison officials.

**[3]** Any argument that the risk to Thomas's health was not "obvious" fails as a matter of law. *See Farmer*, 511 U.S. at 842. *Farmer*'s obviousness requirement does not necessitate a showing that an individual prison official had specific knowledge that harsh treatment of a particular inmate, in particular circumstances, would have a certain outcome. Rather, we measure what is "obvious" in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved. *Id.* For example, for the purposes of an obviousness analysis, a prison warden is deemed to have the general knowledge that is expected, at a minimum, of an individual performing the functions of that job. He cannot disclaim an understanding that is essential to the performance of his duties and that has been announced in our cases for over 30 years. *Id.* ("if an Eighth Amendment plaintiff presents evidence showing that a substantial risk was . . . longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it" such evidence suffices) (citations and quotations omitted).

**[4]** As the district court acknowledged, "[e]xercise is one of the most basic human necessities protected by the Eighth Amendment." Like food, it is "a basic human need protected by the Eighth Amendment." *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *see also Wilson,* 501 U.S. at 304. Our case law uniformly stresses the vital importance of exercise for prisoners. *See LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993) ("Exercise has been determined to be one of the basic human necessities protected by the Eighth Amendment."); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) ("There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical wellbeing of the inmates.").[7] As we held in *Foster*, "if an inmate

___

[7]At least one other circuit has reached a similar conclusion. *See French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (holding that "[l]ack of

presents evidence of very obvious and blatant circumstances indicating that the prison official knew [a substantial risk of serious harm] existed, then it is proper to infer that the official must have known of the risk." 554 F.3d at 814 (citation omitted).

**[5]** It is undisputed by the parties that the prison officials knew the length and scope of Thomas's confinement without outdoor exercise. Prison officials made and reviewed the decision to keep Thomas confined without out-of-cell exercise, and Thomas submitted repeated written and oral complaints to prison officials about his deprivation of out-of-cell exercise. For over thirty years, we have emphasized that "some form of regular outdoor exercise is extremely important to the psychological and physical wellbeing of the inmates." *Spain*, 600 F.2d at 199. California strictly regulates this "regular outdoor exercise," ordinarily requiring prisons to provide inmates held in the general population with at least three hours of exercise per week and inmates held in segregation with at least one hour of exercise per day. Cal. Code Regs. tit. 15, §§ 1065, 3343(h) (2006). The same regulations prohibit disciplining inmates by depriving them of outdoor exercise for more than ten days, absent extreme circumstances. *Id.* § 3322(c).

**[6]** In light of the above, we conclude that the prison officials were aware as a matter of law of the potential consequences of depriving an inmate of out-of-cell exercise for an extended period of time. The mere fact of the total deprivation of Thomas's right to out-of-cell exercise for almost fourteen months is sufficient, in light of the established law, to render it obvious to the prison officials that their actions posed a "substantial risk of serious harm" to Thomas's mental and

exercise may certainly rise to a constitutional violation. Where movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised").

physical health. We therefore reject the district court's ruling to the contrary.

**B.   A genuine issue of material fact exists as to whether the prison officials acted reasonably in depriving Thomas of all out-of-cell exercise for 13 months and 25 days in light of all the circumstances**

[7] The district court concluded that there was insufficient evidence to establish that a genuine issue of material fact existed as to whether the prison officials' deprivation of Thomas's right to out-of-cell exercise was "reasonable." Given the record before us, and the seriousness of the risk to which Thomas was subjected, it is difficult to conceive how the prison officials actions would be deemed "reasonable." Nevertheless, the issue is one of fact that must be presented to a fact-finder.

The district court found that the prison officials acted reasonably in light of Thomas's "lengthy disciplinary history" and of other actual or threatened violence at Facility C in 2005 and 2006, and because Thomas could have signed the pledge form at any time. We reverse this ruling, as well. We hold that the evidence in the record demonstrates that Thomas, at the least, raised a genuine issue of material fact as to whether the prison officials acted reasonably in light of: the serious risk to Thomas's mental and physical health; the level of documented assaults and threats at the facility during the last 11 months Thomas was deprived of exercise; Thomas's limited disciplinary record; his execution of other forms provided by the prison in which he promised to "program nonviolently"; and the prison authorities' failure to consider providing him with alternative opportunities to exercise.

In reaching its conclusion that the prison officials reasonably relied on Thomas's disciplinary history when they decided to deprive him of exercise for almost 14 months, the district court relied on *LeMaire v. Maass*, 12 F.3d 1444 (9th

Cir. 1993) in which a prisoner had attacked a prison guard, "savagely attacked" another inmate, assaulted numerous prison officers with hot water, toilet water, food, feces, and urine, had at least 25 major rule violations in a two year period, and attacked two prison officials as he exited an exercise cubicle (an act "he vowed to repeat" if he were allowed to exercise again). *Id.* at 1448, 1458. The *LeMaire* court found that restricting such a prisoner's exercise privileges was reasonable "because he both abused them and represent[ed] a grave security risk." *Id.* at 1458. However, Thomas's disciplinary history, as it appears in the record before us, bears very little resemblance to LeMaire's. Thomas's record lists only two disciplinary infractions: one episode of battery of an inmate in 2003 and one threat of violence to an inmate in 2002. The only disciplinary infraction during Thomas's 13-month-25-day confinement without out-of-cell exercise was a report filed by a prison official charging him with "willfully obstructing a police officer" because he submitted a complaint to the prison Warden about the officials' refusal to allow him to exercise. *LeMaire*, therefore, has little relevance to the present case.

Furthermore, the evidence in the record demonstrates that the sole reason that Thomas was kept on modified programming was his failure to sign the pledge form, not any fear that prison officials harbored about Thomas's dangerousness. The very fact that as soon as Thomas signed the pledge form he was permitted to engage in out-of-cell exercise shows that the prison officials did not consider him to be intrinsically dangerous, but apparently thought that he was "dangerous" only as long as he refused to sign the form. Both the district court and the prison officials assert that if Thomas had "signed the pledge at any time" he would have "gained immediate access to outdoor exercise."[8] Thus, there was apparently nothing

---

[8]The prison officials concede as much in their brief, where they state that "as the district court noted . . . [Thomas] 'could have signed the pledge at any time and gained immediate access to outdoor exercise' . . . . access to outdoor exercise was easily attainable . . . all he had to do was simply sign the pledge form.' "

about Thomas that warranted deprivation of out-of-cell exercise other than the absence of his signature on the pledge. In addition, the record also shows that, apart from his refusal to sign the pledge form, Thomas cooperated with the multiple interviewers, and committed in writing to non-violence in separate contemporaneous interview forms. The district court did not consider these contemporaneous signed interview forms,[9] even though they pose a significant obstacle to the prison officials' assertion that they deprived Thomas of out-of-cell exercise because they were concerned that he posed a threat of violence to other inmates—a threat that they later say would have been alleviated had he signed the pledge itself.

In reaching its conclusion that the prison officials' refusal to allow Thomas to exercise outdoors was reasonable, the district court also considered the history of violence at SVSP. According to the district court, the prison officials acted reasonably in depriving Thomas of exercise because they were responding to a "genuine emergency." We have held previously that prisons may curtail inmates' outdoor exercise "when a genuine emergency exists." Specifically, "prison officials may be more restrictive than they otherwise may be, and certain services may be suspended temporarily." *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982) *abrogated on other grounds* by *Sandin v. Connor*, 515 U.S. 472 (1995). Such an emergency may occur following outbreaks of extraordinary levels of violence in a prison. *Norwood v. Vance*, 572 F.3d 626, 631 (9th Cir. 2009) ("When violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under control.")

---

[9]The prison officials argue that the district court disregarded these forms because "Thomas never alerted the district judge that these forms were relevant to his outdoor-exercise claim." Thomas, however, cited these forms repeatedly in his opposition papers, including the first two pages of his declaration.

In this case, the prison officials make no substantial argument that the "emergency" caused by the July 14, 2005 incident in which a Facility C inmate stabbed two correctional officers endured for the 13 months and 25 days that Thomas was deprived of out-of-cell exercise. To the contrary, they admit that the lockdown that the "emergency" precipitated lasted for less than two months, from July 14, 2005 to September 9, 2005. Thereafter, the authorities introduced the "modified program," to which individual prisoners were subject until they signed the pledge. The record shows that no further lockdown occurred at the facility, and 148 other Facility C inmates returned to normal programming while the deprivation of Thomas's out-of-cell exercise remained in force.

The prison officials' contention that from July 14, 2005 through June 2006 "there were several other documented threats and assaults that took place at SVSP" does not establish that following the end of the lockdown on September 9, 2005, there was a "state of emergency" in the prison.[10] Documented threats and assaults happen frequently in prisons. Given that an emergency is different from normal prison conduct, an emergency cannot be deemed to exist simply because there are documented threats and assaults from time to time—otherwise every prison would be in a constant state of emergency.

Indeed, Thomas's case is readily distinguishable from our "genuine emergency" cases, upon which the district court relied. The district court cited, for example, *Hayward v. Procunier*, 629 F.2d 599 (9th Cir. 1980), a case in which we

---

[10]Thomas was deprived of exercise for a total of 13 months and 25 days. For the first two months, the prison was on lockdown, for the remaining 11 months and 25 days it was not. During some part of nine of those remaining 11 months, the "documented threats and assaults" are alleged to have occurred. The prison officials offer no evidence that any incidents of any kind occurred during the final two months prior to the date on which Thomas signed the pledge and his exercise privileges were restored.

ruled that a "genuine emergency" existed at San Quentin prison in 1974 following a series of extremely violent incidents. *Id.* at 600, 603. We held that a five-month lockdown of the prison, including restrictions on out-of-cell exercise— initially on all out of cell exercise, but with "[s]ome yard exercise . . . permitted within a month after the lockdown began"—was permissible in such circumstances. *Id.* at 600. The extremely violent incidents, including "82 assaults with weapons and 12 killings, as well as 71 cases of possession of weapons and 2 attempted escapes," *id.*, at San Quentin in 1974 were, however, quite distinct from the single stabbing incident, albeit of two guards, that occurred while Thomas was a prisoner at SVSP.

Moreover, we held that the restrictions on outdoor exercise imposed in *Hayward* were permissible in part because they were temporary, and because the inmates in that case "were allowed approximately the minimum exercise mandated in *Spain* within a month after the imposition of the lockdown." *Id.* at 603. The prison officials contend that Thomas's deprivation of out-of-cell exercise was, like that of Hayward, a "temporary" measure, because Thomas could have signed the pledge at any time. Thomas's 13 month and 25 day confinement without out-of-cell exercise was not, however, "temporary." Whether a deprivation is temporary depends on the expiration date, if any, of the prison's policy, not on whether an individual can escape its application by one means or another. Here, the policy was of indefinite duration. In Thomas's case the deprivation would have lasted even longer than the almost 14 months it did, had Thomas not capitulated and signed the form because the ban on exercise had begun to affect his health.

The district court's conclusion that the prison officials' policy was "reasonable" is also highly questionable in light of the absence of any evidence in the record that the prison officials considered whether there were any alternative means of providing Thomas out-of-cell exercise. Even where security con-

cerns might justify a limitation on permitting a prisoner "to mingle with the general prison population" such concerns "do not explain why other exercise arrangements [are] not made." *Spain*, 600 F.2d at 200; *see also Lopez*, 203 F.3d at 1133 (holding that even if denying Lopez access to the general recreation yard was reasonable, "it does not explain why Lopez was not given some other opportunity for outdoor exercise."). The prison officials argue that "Thomas was offered alternatives to no exercise, when Defendants offered him opportunities for outdoor exercise once in August 2005, once in September 2005, once in October 2005, twice in November 2005, and an unspecified number of times between January 2006 and June 2006." The occasions cited by the prison officials are, in each case, those on which Thomas was offered the pledge form and refused to sign, not occasions on which he was offered "some other opportunity for outdoor exercise," and declined to accept that offer.

The prison officials' repeated assertion that the deprivation of exercise was "reasonable" because Thomas could have signed the pledge form at any time and thereafter would been permitted to exercise misses the point completely and is entirely inconsistent with our previous holdings. *See Foster*, 554 F.3d at 814. As we discuss *supra*, we have held that deprivation of exercise may be "reasonable" in certain situations, such as during a "state of emergency" in a prison, or when a prisoner poses such a threat to inmates or guards that his confinement without exercise is the only way to maintain the security of the facility. Under the circumstances present here, however, in which the punishment of deprivation of exercise appears clearly not to have been necessary to maintain order in the prison, it is difficult to conceive of how a deprivation of a "basic human necessity," *LeMaire*, 12 F.3d at 1457, may be deemed reasonable. Thomas testified that during the 13 month 25 day period of confinement without out-of-cell exercise he did not sign and had no intention of ever signing the pledge form. Like the inmate in *Foster*, Thomas refused repeatedly to abide by a prison policy, and

complained to prison officials about the deprivation inflicted upon him by prison officials in response to his refusal to adhere to the policy.[11] *Foster*, 554 F.3d at 812. In common with Foster, Thomas could have chosen to behave differently, but he did not, and in punishing him for that choice the prison officials placed him at risk of substantial physical and mental harm. *Id.* at 812-14. We therefore hold that, as in *Foster*, Thomas has, at the very least, raised a genuine issue of material fact as to whether the prison officials' actions were reasonable.

[8] In sum, Thomas has, at the very least, raised a genuine issue of material fact as to whether the prison officials acted reasonably in denying him of all out-of-cell exercise for 13 months and 25 days. The record shows that Thomas had already promised to "program non-violently" in the separate interview forms that he signed. Neither Thomas's own limited disciplinary record, nor the occasional documented threats or acts of other prisoners appears to have rendered it reasonable to deprive him of all out-of-cell exercise opportunities during the lengthy period involved. The record also reflects that the prison officials failed to consider other ways of providing Thomas with sufficient exercise that would not have implicated any of their purported security concerns. Finally, the prison authorities' contention that Thomas could have signed the pledge form at any time would not appear to provide a justification for their actions over so long a period. We therefore hold that the district court erred in ruling that there was insuf-

---

[11]The prison officials do not argue explicitly that Thomas's refusal to sign the pledge form demonstrated a dangerous resistance to authority or a failure to comply with or abide by the rules that justified his prolonged confinement without exercise. Even if the prison officials had made such an argument, however, and even if such an argument had merit, it would be highly unlikely to outweigh the prison officials' responsibility to safeguard an inmate's health. It is thus hard to envisage any circumstances in which the refusal to sign a form would justify jeopardizing an inmate's health by depriving him of all opportunity to exercise for almost 14 months.

ficient evidence to raise a genuine issue of material fact as to whether the prison officials acted reasonably. Accordingly, we reverse the district court's ruling granting summary judgment to the prison officials.

We should add that we have difficulty in conceiving how the prison officials might be able to justify the deprivation of so critical a human necessity as exercise for a period of almost 14 months on the basis of "reasonableness," as they would have been willing to allow Thomas to enjoy out-of-cell exercise throughout almost all of this period if he had signed the pledge form. Nevertheless, because we are asked to decide only whether the district court's ruling on the prison officials' motion for summary judgment was erroneous and because Thomas has not asked us to grant him relief in the form of summary judgment, we are reluctant to do more than reverse and remand for further proceedings.

## C.   We decline to reach the prison officials' argument that they are entitled to qualified immunity

The district court did "not reach defendant's argument that they are entitled to qualified immunity," because it found that Thomas had failed to make any actionable constitutional claims. The prison officials suggest that, irrespective of our ruling on Thomas's constitutional claims, we should affirm the district court's grant of summary judgment to the prison officials on the ground of qualified immunity.

In order to establish qualified immunity, a government official must show that his "conduct has not violated any 'clearly established' constitutional right of which a reasonable person would have known." *Foster*, 554 F.3d at 812 (internal quotation marks omitted). Although the prison officials have raised this issue on appeal, they have not attempted to show how or why each of the named prison officials is entitled to qualified immunity, nor did they do so before the district court. Certainly none has shown any reason for such relief in light of

our reversal and remand on the question of a constitutional violation.

**[9]** In light of the above, we decline to consider the question of qualified immunity for the first time on appeal, and remand the case to the district court to consider that issue in the first instance, at such time in the further proceedings as it may be appropriate to do so.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS IN LIGHT OF THIS OPINION.**

---

FRIEDMAN, Circuit Judge, dissenting:

In my view, the appropriate and dispositive inquiry in this case is whether the prison officials abused their discretion or otherwise acted unreasonably in requiring the prison inmates, as a condition of their release from various restrictions imposed following a lockdown (including the ability to leave their cells for outdoor exercise, the restriction here at issue), to sign a pledge that they would not engage in violent conduct if they were so released. Since I conclude that the prison officials did not abuse their discretion, I would affirm the district court's grant of summary judgment dismissing the inmate's damage suit under 42 U.S.C. § 1983, alleging that denying him outdoor exercise for almost fourteen months because of his refusal to sign the pledge, subjected him to cruel and unusual punishment in violation of the Eighth Amendment.

The appellant Thomas was housed in a maximum security unit of a California state prison. The prison was locked down after another inmate in the unit stabbed and seriously wounded two correctional officers. The lockdown, during which prisoners were confined to their cells and could leave them only in emergencies or for extraordinary circumstances, was in effect for approximately two months.

When the lockdown ended, the prison officials introduced a "modified" program containing many of the same restrictions that had existed during the lockdown, including the prohibition on leaving the cell for outdoor exercise. To leave the "modified" program and to return to a "normal" one, inmates were required to be interviewed and to sign a pledge. In his interviews, Thomas answered "yes" to the following questions on an interview form: "Programming on a level IV general population yard requires participation without violence. Are you willing to commit to this type of program? If not, give details?" "If the facility were returned to normal program, could you program without violence on a level IV general population yard with inmates from all races/ethnics [sic] or past or present gang affiliations?" He answered "no" to the question "Do you have any safety concerns?"

The pledge form that Thomas refused to sign for a substantial period, although he was asked to do so on several occasions and apparently informed that if he did so he could have outdoor exercise, contained the following statement:

> By signing this document, I am advising staff that I want to participate in the program review process being implemented at this time. I am also stipulating that I want to "do my own time" and will program by not participating in gang violence.

Prison officials, headed by the warden, are responsible for maintaining order and imposing discipline in the prison. They must protect the inmates and prison employees, including the guards and correctional officers, against violence and injury. In carrying out these responsibilities, they necessarily must have broad discretion in deciding how to run the prison and to determine what steps are appropriate and necessary to deal with particular situations and problems as they arise. Since the facility where Thomas was housed was a maximum security unit, one must assume that its inhabitants included many violent and dangerous prisoners.

Considering all the circumstances, I cannot say that the prison officials abused their discretion or otherwise acted unreasonably in requiring the inmates of that maximum security unit to sign the pledge form containing the commitment not to engage in violence, as a condition of their returning to the regular prison program, which included outdoor exercise.