NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

DEC 23 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

CALVIN MALONE,

              Plaintiff-Appellant,

    v.

LESLIE SZIEBERT, Washington State
Special Commitment Center Chief Medical
Director,

              Defendant-Appellee.

No.    19-36038

D.C. No. 3:15-cv-05552-RBL

MEMORANDUM*

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted October 18, 2022
Seattle, Washington

Before:  TALLMAN, R. NELSON, and FORREST, Circuit Judges.
Dissent by Judge FORREST.

    Appellant Calvin Malone sued Appellee Dr. Leslie Sziebert, the Medical

Director at the Washington Special Commitment Center ("SCC"), under 42 U.S.C.

§ 1983 for violating his due process rights.  Malone alleges Dr. Sziebert is liable for

inadequate medical treatment Malone received while civilly committed at the SCC.

---

    *    This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

Malone ruptured his Achilles tendon and did not see a specialist for more than two months.

The district court first granted summary judgment for Dr. Sziebert on Malone's due process claim because Dr. Sziebert did not personally participate in Malone's medical treatment. *Malone v. Sziebert*, No. 3:15-CV-05552-RBL-DWC, 2018 WL 1384490 (W.D. Wash. Feb. 23, 2018), *report and recommendation adopted*, 2018 WL 1365841 (W.D. Wash. Mar. 16, 2018). We vacated the district court's order and remanded for further proceedings. *Malone v. Sziebert*, 744 F. App'x 406 (9th Cir. 2018) (*Malone I*). On remand, Dr. Sziebert produced a revised declaration with additional details. The district court again granted summary judgment for Dr. Sziebert. *Malone v. Sziebert*, No. 3:15-CV-05552-RBL-DWC, 2019 WL 6096166 (W.D. Wash. Oct. 17, 2019), *report and recommendation adopted*, 2019 WL 6052417 (W.D. Wash. Nov. 15, 2019). We affirm.

For a supervisor to be liable under § 1983, there must be "either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). There is a causal connection if the supervisor set "in motion a series of acts by others" or "knowingly refused to terminate a series of acts by others, which the supervisor knew or reasonably should

have known would cause others to inflict a constitutional injury." *Id.* at 1207–08 (cleaned up). "[A]cquiescence or culpable indifference may suffice to show that a supervisor personally played a role in the alleged constitutional violations." *Id.* at 1208 (internal quotations omitted). But there is no respondeat superior liability under § 1983. *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018).[1]

Malone maintains there is a genuine dispute about whether Dr. Sziebert acquiesced in or was culpably indifferent to Malone's unconstitutional care. He argues that Dr. Sziebert knew about the delay in Malone's treatment and was responsible for scheduling off-island medical appointments. Neither argument prevails because there is a failure of proof to refute Dr. Sziebert's revised testimony.

First, the record shows that Dr. Sziebert was unaware of Malone's treatment delay. Dr. Sziebert's deposition shows only that he was aware *at the time of his*

---

[1] The dissent conflates the standard of care to which Malone is entitled with the standard for supervisory liability. We agree that the standard of care required for civilly committed individuals is higher than in the prison context. *Mitchell v. Washington*, 818 F.3d 436, 443 (9th Cir. 2016). But the supervisory liability standard applies broadly to § 1983 claims against supervisors, and it does not change based upon the standard for assessing the underlying constitutional deprivation. *See, e.g.*, *S.R. Nehad v. Browder*, 929 F.3d 1125, 1141 n.14 (9th Cir. 2019) (involving a claim of excessive force by a police officer); *King v. Cnty. of Los Angeles*, 885 F.3d 548, 559 (9th Cir. 2018) (involving a civil detainee's challenge to his conditions of confinement); *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018) (involving a claim against child protective services for removing a child from her mother's custody); *Henry A. v. Willden*, 678 F.3d 991, 1003–04 (9th Cir. 2012) (involving a claim of deliberate indifference by foster children against state defendants for exposing the children to danger).

*deposition* that Malone's initial appointment was not carried out because of a limit imposed by SCC security on the number of off-island medical trips per day. Dr. Sziebert testified that, when Malone was injured, Dr. Sziebert was assured Malone would get a timely appointment to treat his injury. And Dr. Sziebert's testimony that at times the health and safety of SCC residents are compromised due to the remote location of the facility on an island in Puget Sound shows only that the SCC's geographic location impacts the residents' access to medical care. We find no evidence that Dr. Sziebert contemporaneously knew about the delay in Malone's treatment; the evidence shows that Dr. Sziebert promptly authorized Malone's off-island appointment and believed the appointment would take place.

Second, the record shows that Dr. Sziebert was not responsible for scheduling off-island medical appointments. In his deposition, Dr. Sziebert stated that SCC security was responsible for the limitation on the number of off-island medical trips per day. In his declaration, Dr. Sziebert stated that he was not responsible for that limitation and he understood the limitation was set by SCC security based upon available staffing levels. *See Youngberg v. Romeo*, 457 U.S. 307, 323–25 (1982) (indicating immunity would lie where an alleged constitutional violation is caused by staffing issues outside the professional's control). It is unrefuted that Dr. Sziebert was not involved in scheduling off-island appointments for Malone.

Dr. Sziebert's position description is not evidence to the contrary. The

4

position description shows that Dr. Sziebert, as medical director, bore supervisory responsibility for the overall activities of the SCC medical department. This is no basis for finding personal involvement under § 1983. Finding that Dr. Sziebert was personally involved or should have been personally involved based on his general supervisory responsibility for overseeing the medical department would hold him vicariously liable, which is impermissible under § 1983. *Felarca*, 891 F.3d at 820–21.

Malone points to portions of the position description which state that the Medical Director provides "final medical authorizing authority for discretionary patient medical trips to see community providers," and that the Medical Director's general oversight of "when and how much use to make of community health care services" has a "financial impact on the agency." These statements establish only that Dr. Sziebert was responsible for *authorizing* off-island medical appointments (which is exactly what he did for Malone) and that he had general oversight for the SCC medical department. These portions of the position description say nothing about whether Dr. Sziebert was responsible for scheduling appointments, whether he could control when Malone saw a specialist, whether he could expedite Malone's appointment, whether he could override the limitation on off-island medical

5

appointments, or whether he had any authority over SCC security.[2]

Contrary to the dissent, our conclusion accords with our prior decision. There, we *vacated* the district court's opinion rather than reverse because it was "not clear from the record whether [Dr.] Sziebert, or someone else, [was] responsible for scheduling patients to be transported to medical services." *Malone I*, 744 F. App'x at 407. We could not say, on that earlier record, whether Dr. Sziebert was entitled

---

[2] The dissent faults us for failing to address whether Dr. Sziebert *should have known* about Malone's treatment delay. But we cannot impose liability where the supervisor merely should have known about a constitutional violation. The supervisory liability standard requires acquiescence, culpable indifference, or knowingly refusing to prevent actions the supervisor reasonably should have known would cause a constitutional violation. *Starr*, 652 F.3d at 1207–08. The evidence in the record shows that Dr. Sziebert was unaware of the treatment delay *and* lacked control over the security limitation on staffing off-island appointments. There is no evidence that he acquiesced in, was culpably indifferent to, or *knowingly* failed to stop a constitutional violation he reasonably should have known about. *See id.*

Even under *Ammons v. Washington Department of Social and Health Services*, 648 F.3d 1020 (9th Cir. 2011), relied on by the dissent, the outcome is the same. In *Ammons*, we found a genuine dispute about whether a constitutional violation occurred where there was evidence that a state hospital administrator knew there was a risk of a constitutional violation, had the ability to prevent it, and failed to do so. *See id.* at 1033–35. By contrast, even if Dr. Sziebert's testimony that the facility's location occasionally compromises patient safety is evidence that he was aware of the potential risk of Malone's treatment delay, there is no evidence that Dr. Sziebert could have prevented it because, based on the evidence in the record, he had no control over the limitation on off-island appointment scheduling. To hold Dr. Sziebert liable for a civil rights violation based on his position description would impermissibly hold him vicariously liable. *See Felarca*, 891 F.3d at 820–21. In *Ammons*, we stated that the administrator was not being held vicariously liable based on her supervisory position alone but was held accountable for "her own failure to manage and supervise her employees." 648 F.3d at 1034 n.16. Where the evidence shows that Dr. Sziebert had no supervisory authority over SCC security, the record shows no such failure here.

6

to summary judgment. *Id.* We cited portions of Dr. Sziebert's position description and deposition testimony that underscored our uncertainty about whether Dr. Sziebert was responsible for scheduling medical appointments. *Id.*

But on remand, that question has now been answered. Dr. Sziebert's declaration is unrebutted evidence that he had no personal involvement in, and was not responsible for, scheduling off-island medical appointments or setting limits on the number of off-island medical trips per day. His declaration makes explicit what he already stated in his deposition: that SCC security was responsible for the limitation on the number of off-island medical trips per day. Thus, there is no longer a genuinely disputed fact about whether Dr. Sziebert was responsible for off-island appointment scheduling—the evidence in this record shows that he was not. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

**AFFIRMED.**

7

*Malone v. Sziebert*, No. 19-36038
Forrest, J., dissenting:

Defendant Dr. Leslie Sziebert, the Medical Director at the Washington Special Commitment Center (SCC), argues *as a matter of law* that he is not liable for Plaintiff Calvin Malone's alleged unconstitutional denial of medical care because (1) he did not establish the policy limiting the number of off-island medical transports that could happen per day and (2) other medical staff scheduled Malone's needed medical transport. The court agrees. I respectfully dissent because law of the case from our decision in *Malone v. Sziebert*, 744 F. App'x 406 (9th Cir. 2018) (*Malone I*), establishes that there is a material factual dispute that renders summary judgment inappropriate. The court also misconstrued and misapplied the legal standard for supervisory liability.

1.  "[T]he prudential law-of-the-case doctrine precludes one panel of an appellate court from reconsidering questions which have already been decided on a prior appeal in the same case." *Gonzalez v. U.S. Dep't of Homeland Sec.*, 712 F.3d 1271, 1277 (9th Cir. 2013). "[A] prior decision should be followed unless . . . *substantially different evidence* was [subsequently] adduced . . . ." *Id.* (emphasis added) (quoting *Hegler v. Borg*, 50 F.3d 1472, 1475 (9th Cir. 1995)); *see also Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993) (explaining that the law of the case is also ordinarily binding on lower courts). In *Malone I*, we held that there are material questions of fact regarding whether Dr. Sziebert was responsible for

1

Malone's alleged constitutional violations related to his medical treatment. *Malone I*, 744 F. App'x at 407. We explained that it was unclear who was "responsible for scheduling patients to be transported to medical services," but, in his role as Medical Director, Dr. Sziebert "has 'extensive input into the daily operation of clinical and residential programming,' authority 'over the entire scope of the [SCC] Program and all of its residential venues,' and 'direct responsibility for the oversight of all SCC medical policies.'" *Id.* (alteration in original). We also noted that Dr. Sziebert acknowledged that he was aware (1) "Malone had an outpatient appointment that was 'not carried out . . . because of a stricture that security placed on [SCC] that there was only two medical trips out,'" and (2) "there [are] occasions when the health and safety of a resident is compromised due to the physical location of the facility and the length of time it takes to transport a patient to medical services." *Id.* (alterations in original). On this record, we concluded that Dr. Sziebert was not entitled to summary judgment because a "supervisor can be liable under § 1983 for 'knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury.'" *Id.* (quoting *Felarca v. Birgeneau*, 891 F.3d 809, 819–20 (9th Cir. 2018)).

On remand after *Malone I*, Dr. Sziebert filed a revised declaration adding two paragraphs to his prior declaration clarifying that (1) he was not responsible for limiting the number of off-island medical trips that could occur per day; and (2)

2

Malone's off-island medical visits were scheduled by "primary care providers contracted to SCC, and SCC medical staff." This is the only additional substantive evidence added to the record after *Malone I*. These two statements are not "substantially different evidence" from what was presented in *Malone I* such that we can now reach a different result. *Gonzalez*, 712 F.3d at 1277.

As the court today notes, the first statement is not "different" at all. It merely made "explicit" what Dr. Sziebert had "already stated in his deposition," which we relied on in vacating the district court's grant of summary judgment in *Malone I*. Mem. Disp. at 7. Likewise, the second statement does not materially change the evidence of Dr. Sziebert's potential liability given his role as Medical Director and supervisor of the other medical staff. The record (before and now) indicates that Dr. Sziebert supervised "16 FTE medical staff," and "professional and paraprofessional state and contracted employees who provide services to SCC residents," and oversaw "the program's designated primary care medical provider." His clarification that Malone's medical transports were scheduled by these professionals—whom he supervised—does nothing to undermine the basis for *Malone I*'s conclusion that Dr. Sziebert may be held liable for "knowingly refusing to terminate a series of acts by others, which [he] knew or reasonably should have known would cause others to inflict a constitutional injury." *Malone I*, 744 F. App'x at 407 (quoting *Felarca*, 891 F.3d at 819–20). Because the evidence before us is not

3

"substantially different" from the evidence presented in *Malone I*, the court erred by granting Dr. Sziebert's renewed effort to obtain summary judgment.

2.  Even if established law of the case did not resolve this appeal, summary judgment is still unwarranted. We must determine whether there are any genuine disputes of fact by "viewing the evidence in the light most favorable *to the nonmoving party*." *Soto v. Sweetman*, 882 F.3d 865, 869 (9th Cir. 2018) (emphasis added) (citation omitted). Because Malone, a civil detainee, was acting pro se in the district court, we "should avoid applying summary judgment rules strictly." *Id.* at 872 (internal quotations omitted) (quoting *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)).

Civil detainees have a Fourteenth Amendment due process right to adequate medical care assessed under the professional-judgment standard in *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). *Mitchell v. Washington*, 818 F.3d 436, 443–44 (9th Cir. 2016) (applying *Youngberg* professional-judgment standard in case involving civil detainee at Washington SCC). A defendant is liable under this standard when his decision or lack of decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [he] actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. A professional in a supervisory role is liable under this standard for "inaction and poor supervision" amounting to "fail[ure] to exercise professional judgment."

4

*Ammons v. Wash. Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1033–34 (9th Cir. 2011); *see also id.* at 1034 n.16.

The court's analysis of this issue has several deficiencies. First, the court misconstrues the supervisory-liability standard by not meaningfully engaging with *Youngberg* with regard to Dr. Sziebert's conduct. Instead, the court cites the general supervisory-liability standard that provides a supervisor may be held liable only if the supervisor is directly involved in a constitutional deprivation or there is a "causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)). True enough—a supervisor must have engaged in wrongful conduct himself because § 1983 does not impose respondeat superior liability. *See id.* But the court fails to address that what constitutes "wrongful conduct" or a "constitutional deprivation" is different for prisoners whose rights arise under the Eighth Amendment than for civil detainees whose rights arise under the Fourteenth Amendment. *Compare Ammons*, 648 F.3d at 1027 (explaining a defendant violates a civil detainee's Fourteenth Amendment right to safe conditions under *Youngberg* where his "conduct diverges from that of a reasonable professional"), *with Starr*, 652 F.3d at 1205–06 ("The gravamen of [inmate] Starr's [Eighth Amendment] claim against [the supervisor-sheriff] is deliberate indifference.").

5

Under the Eighth Amendment, the watchword is *deliberate indifference* because a convicted prisoner is properly subject to punishment, has significantly reduced liberty interests, and his constitutional right at issue is protection against cruel and unusual punishment. *See Ammons*, 648 F.3d at 1027. Thus, a supervisor in this context violates the constitution only where the supervisor "knew or reasonably should have known" of conduct causing constitutional harm and "acquiesced" in the constitutional deprivation. *Starr*, 652 F.3d at 1207–08 (finding plaintiff's allegations were sufficient "to state a claim of supervisory liability *for deliberate indifference*" (emphasis added)). On the other hand, a civil detainee is not subject to punishment and his rights arise under the Fourteenth Amendment Due Process Clause where we must "weigh[] the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Youngberg*, 457 U.S. at 320. A state official in this context commits a constitutional deprivation if the official "substantial[ly] depart[s] from accepted professional judgment, practice, or standards." *Id.* at 323. And a supervisor in this context who is responsible for "taking adequate steps to ensure that [his] subordinates maintain the safety of the patients" and who is "ultimately accountable for the safety of the patients," is liable if his "inaction and poor supervision" amount to "fail[ure] to exercise professional judgment." *Ammons*, 648 F.3d at 1033–34 (internal quotations omitted); *see also id.* at 1034 n.16.

6

Applying the proper supervisory-liability standard, Dr. Sziebert has not shown, *as a matter of law*, that his supervision of the SCC medical staff's treatment of Malone's injury was an exercise of accepted professional judgment. As Medical Director, Dr. Sziebert was "directly accountable for the processes and outcomes related to [the] Health Clinic operations." He provided "direct medical oversight over the SCC Health Clinic operations and provide[d] working direction to over 16 FTE medical staff including 6 registered nurses and numerous contracted medical and dental service providers." Dr. Sziebert knew about Malone's serious injury and authorized his off-island transport to see a specialist. Dr. Sziebert also knew about "complaints regarding the lack of proper medical care at SCC," and testified that there may be "occasions when the health and safety of a resident is compromised due to the physical location of the facility and the length of time it takes to transport a patient to medical services." Given Dr. Sziebert's awareness of Malone's ruptured Achilles tendon, his determination that Malone needed to see an off-island specialist, his accountability for patient outcomes as Medical Director, and his knowledge of the problem in getting timely transports for medical care, there is a material factual dispute for trial regarding whether Dr. Sziebert may be held liable for violating Malone's constitutional rights by allowing his ruptured Achilles tendon to go untreated for two months. *See Ammons*, 648 F.3d at 1031–33 ("[A] jury could conclude that a reasonable hospital administrator in [defendant]'s position of

7

authority . . . would have taken steps to become aware of what was happening . . . .").

Second, even if the court were correct to focus narrowly on *Starr*'s general supervisory-liability standard without regard to the relevant underlying standard of care, the court misapplied this standard. The court concludes that Dr. Sziebert cannot be held liable because there is "no evidence that [he] contemporaneously *knew* about the delay in Malone's treatment." Mem. Disp. at 4. In doing so, the court ignores that *Starr* also establishes liability where a supervisor "reasonably should have known" staff under his supervision were causing a constitutional violation and acquiesces in the violation.[1]

Finally, the court improperly construes the facts in Dr. Sziebert's favor. Dr. Sziebert testified at deposition in response to Malone's pro se questioning that "[t]he awareness I have is that we had an outpatient appointment for you . . . that was not carried out . . . ." This testimony is vague because Dr. Sziebert did not clarify when he knew that Malone had not received the needed treatment. Dr. Sziebert could have learned about Malone's appointment delays as the relevant events unfolded or much later in litigation. The court impermissibly resolves this ambiguity for

---

[1]Although the court appears to acknowledge that Dr. Sziebert may be liable for his acquiescence or "culpabl[e] indifferen[ce]," it does not analyze this standard. The court also misconstrues Malone's argument as resting on a theory of Dr. Sziebert's actual knowledge when Malone also argues that Dr. Sziebert may be held liable because he "should have known" of the inadequate medical treatment.

8

Dr. Sziebert by pointing to his other self-serving testimony that he was "assured" Malone was "going to get an elected outpatient appointment."[2] It is not the court's role to "weigh the evidence" at summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The court also points to Dr. Sziebert's declaration and deposition testimony stating that he was not responsible for limiting the number of off-island medical transports, as evidence that Dr. Sziebert did not acquiesce in the alleged constitutional violation. But this says nothing about Dr. Sziebert's responsibility for overseeing the clinic and ensuring that medical resources are appropriately allocated, and patients are prioritized for transportation based on patient need. Dr. Sziebert was responsible for the clinic's operational outcomes and for overseeing the medical staff, who, according to him, were responsible for scheduling Malone's appointment. He was also responsible for SCC's medical policies, which may include triage policies. Dr. Sziebert also may have had responsibility for ensuring patients are timely transported to off-island medical care when they cannot be placed on the off-island ferry. He testified that in serious cases, "[w]e've air-evac'd people off the island." Dr. Sziebert's declaration stating that he did not personally schedule Malone's off-island transport does not resolve the factual questions presented

---

[2]This testimony could be construed as indicating Dr. Sziebert knew about Malone's appointment delays before the litigation because it indicates that he communicated with SCC staff about Malone's appointment.

9

regarding his supervisory liability, and whether Dr. Sziebert had the ability to prevent Malone's injury by determining which patients received priority for off-island medical trips.

A person in Dr. Sziebert's position can be held liable not just for his affirmative actions, but also for culpable inaction. *See Ammons*, 648 F.3d at 1027–34; *Starr*, 652 F.3d at 1208. We previously concluded that, viewed in favor of Malone, the evidence indicated that there are genuine factual disputes regarding Dr. Sziebert's responsibility for Malone's delayed medical treatment for a jury to resolve. *Malone I*, 744 F. App'x at 407. This factual dispute still persists where the record has not meaningfully changed since our decision in *Malone I*.

Accordingly, I respectfully dissent.