Opinion by Judge B. FLETCHER; Partial Concurrence and Partial Dissent by Judge BYBEE.
OPINION
B. FLETCHER, Circuit Judge:
Appellants Mary LaFond (“LaFond”) and Norman Webster (“Webster”) (collec *1023 tively “Appellants”), relying on qualified immunity, appeal the district court’s order denying their motion for summary judgment. Appellee Crystal Ammons (“Ammons”) sued LaFond and Webster under 42 U.S.C. § 1983 for violating her Fourteenth Amendment substantive due process right to safe conditions while in the custody of a state-run mental institution. The district court denied Appellants’ motion for summary judgment, rejecting both LaFond’s and Webster’s claims of qualified immunity. It concluded that the record, when read in the light most favorable to Ammons, supported the claim that Appellants failed to exercise professional judgment with respect to Ammons’s safety. Appellants timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part and reverse in part.
I.
The events in this case took place at the Washington State Department of Social and Health Services’s (“DSHS”) Child Study and Treatment Center (“CSTC”). The CSTC is a residential psychiatric hospital for severely emotionally and behaviorally disturbed children, which, in 2001, served approximately forty-eight inpatients. CSTC’s residents are both patients at CSTC and in its custody.
Appellant Mary LaFond was CSTC’s Chief Executive Officer from 1995 to the end of March 2003. Appellant Norm Webster worked intermittently at CSTC in various capacities between 1970 and 1990. He then served as the Director of Nursing Services from January to April 2003.[1] In April 2003, upon LaFond’s departure from CSTC, Webster succeeded her as CSTC’s CEO.
On February 10, 2000, during LaFond’s tenure as CEO, she received a letter from CSTC Director of Nursing Services, Mary Claire Rutherford, which raised, among other things, concerns about improper clinical staff handling of reported sexual incidents in the resident cottages.
In early 2001, also during LaFond’s tenure, a patient at CSTC (“Resident A”) alleged that a male staff member named Anthony Grant had sexually molested her. These allegations were reported to Child Protective Services (“CPS”) and, according to LaFond, Grant’s access to the female patients was restricted during the resulting investigation. CPS conducted interviews with Resident A, Grant, other staff, and at least one patient. Resident A repeated to the CPS investigator that Grant had molested her. While later speaking with Dr. Jan Bacon, the resident psychologist, however, she recanted her accusation, stating at the same time that she was upset about losing contact with Grant. After LaFond informed the CPS investigator that Resident A had recanted, CPS concluded that the allegations were “unfounded” and closed the investigation.
In October 2001, after CPS closed its investigation of Grant, Crystal Ammons was admitted to CSTC. Ammons was a thirteen-year-old girl who had become a dependent of the State of Washington at the age of four. Prior to her placement at CSTC, Ammons had been raised by her maternal grandmother and then by an aunt and uncle; she was removed from her aunt and uncle’s care after she reported that her uncle had sexually abused her. Ammons’s uncle was ultimately convicted of molesting her. She was moved into foster care in March 1995, at age seven. Between the ages of seven and eighteen, Ammons was placed in various residential care facilities and psychiatric hospitals, one *1024 of which was CSTC.[2] In October 2001, when she began residing at CSTC, Ammons was in the foster care of social worker Corrie Tienhaara (“Tienhaara”) and her family.
While Ammons was at CSTC, she stayed in regular contact with Tienhaara, who became concerned about Ammons’s preoccupation and seemingly close relationship with Grant. Tienhaara’s concerns grew upon learning that Grant had given Ammons gifts, including a stuffed animal and compact discs. Tienhaara visited CSTC for the first time in November 2002, at which time she communicated her concerns about Grant to Ilys Hernandez (“Hernandez”), the head of Ammons’s cottage at CSTC. Tienhaara voiced her concerns in a straightforward manner, and she specifically requested that Grant not be permitted to be alone with Ammons. In response, Hernandez told her that Grant was never alone with Ammons and that CSTC had a strict policy against male counselors being alone with female patients. Hernandez did not reveal that any other allegations of abuse had been made against Grant.
In March 2003, Hernandez accompanied Ammons to Tienhaara’s home in North Dakota, in preparation for her discharge from CSTC and her transition back into Tienhaara’s family. There, Tienhaara repeated her concerns to Hernandez, and was again reassured that Grant and Ammons would not be alone together. In late March 2003, however, Tienhaara learned Ammons was scheduled to go on a one-on-one outing with Grant. When she called Hernandez to voice her objection, she was told that the facility “[wouldn’t] go ahead and approve that.”
Ammons’s file reveals that, during her time at CSTC, the CSTC staff documented 188 incidents of Ammons’s flirtatious behavior with male staff. The notes associated with her evaluations indicate that she had “boundary problems” with the staff, and they direct staff members to closely monitor her interactions specifically with male employees. Throughout the early part of 2003, before Ammons left the facility, it was further noted that Ammons had a “crush” on one of the male staff members, and that she was spending time with him alone and seeking out his attention.
Jessica Ramsey, a fellow patient at CSTC who was friends with Ammons, testified that Grant was “extremely flirtatious” with her and Ammons, and that their flirtatious interactions were apparent to Hernandez and Dr. Bacon. She further testified that it was obvious how infatuated Ammons was with Grant, but that no restrictions were ever placed on Grant’s interactions with Ammons or Ramsey. Rather, according to Ramsey, the frequency of Grant’s interactions with her and Ammons continued to escalate. Ramsey stated that she and Ammons would pass notes through other staff members to Grant so often that “the night shift was getting mad” at her. She also testified that she and Ammons had “entire sections on the walls of [their] room (where any staff member could see them) ... dedicated to Mr. Grant,” where they posted flirtatious signs such as “Hottie Alert Tony,” and “Tony’s Finer than Silk.”
According to Ramsey, Grant gave Ramsey and Ammons pictures of himself, letters, stuffed animals for Valentine’s Day, music CDs and, at least to Ramsey, his personal cell phone number. On one occasion, Grant painted Ramsey’s nails. Ramsey testified that she was often alone with Grant in the cottage’s TV room or in her “pod,” a part of the cottage with female *1025 bedrooms, including hers. She further testified that she “once or twice” saw Grant and Ammons leave through the pod door to go to the “canteen,” a part of the building "with a soda machine and a snack machine.
On April 18, 2003, Ammons was discharged from CSTC and went to live in North Dakota with Tienhaara and her family. After Ammons left CSTC, Tienhaara discovered that she and Grant were corresponding via e-mail. These e-mails were extremely flirtatious and revealed that Ammons and Grant were romantically involved. For example, Ammons signed her e-mails “Crystal Grant,” and Grant once wrote, “Wanna go to the canteen tonight? ;) (I wish!).” Shortly after Tienhaara discovered the e-mails, Ammons told her that Ammons and Grant had been sexually involved from January 2003 until she left CSTC. The relationship Ammons described included sexual intercourse and other types of sexual activity that took place on multiple occasions in the “canteen area.” At the time this sexual relationship began, Grant was twenty-nine years old, and Ammons was fourteen. Tienhaara contacted CSTC about this molestation, and CSTC placed Grant on leave. After investigating the matter for several months, CSTC concluded that Grant had, while on duty, engaged in sexual intercourse with Ammons during her residence at the facility. CSTC eventually fired Grant.[3]
Ammons sued DSHS, LaFond, and Webster in Pierce County Superior Court, alleging that (1) DSHS was negligent under state law for failing to protect her from the “known dangerous proclivities of Anthony Grant,” and (2) LaFond and Webster were deliberately indifferent to Ammons’s safety, in violation of 42 U.S.C. § 1983. The case was removed to federal district court. After the exchange of some discovery, Ammons moved for summary judgment. Appellants cross-moved for the same, arguing that they were entitled to qualified immunity.
The district court denied all parties’ motions for summary judgment, finding that issues of material fact remained unresolved. The court held that LaFond and Webster were not, under Neely v. Feinstein, 50 F.3d 1502 (9th Cir.1995), entitled as a matter of law to qualified immunity. The court reasoned that, viewed in the light most favorable to Ammons, the evidence established that LaFond and Webster had “numerous warnings” of the risk posed to Ammons by Grant, and that Appellants “did literally nothing” in response to those warnings. LaFond and Webster timely appealed. The issue of whether they are entitled to qualified immunity is now before us.
II.
We first resolve whether we have jurisdiction to hear this interlocutory appeal. “[A] district court’s denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable ‘final decision’ within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.” Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). This is because “[w]hen summary judgment is denied to a defendant who urges that qualified immunity shelters her from suit, the court’s order finally and conclusively disposes of the defendant’s claim of right not to stand trial.” Ortiz v. Jordan, - U.S. -, 131 S.Ct. 884, 891, 178 L.Ed.2d 703 (2011) *1026 (citing Mitchell, 472 U.S. at 527, 105 S.Ct. 2806) (internal quotation marks and alteration omitted). “[T]he appealable issue is a purely legal one: whether the facts alleged [ ] by the plaintiff ... support a claim of violation of clearly established law.” Mitchell, 472 U.S. at 528 n. 9, 105 S.Ct. 2806. Accordingly, “[o]ur jurisdiction in these matters generally is limited to questions of law and does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact.” Jeffers v. Gomez, 267 F.3d 895, 903 (9th Cir.2001); see also Ortiz, 131 S.Ct. at 891. “Where disputed facts exist, however, we can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct.” Jeffers, 267 F.3d at 903 (citations omitted).
In this appeal, we are asked to resolve multiple issues of law, including the correct standard under which to assess alleged violations of Fourteenth Amendment substantive due process rights by state hospital administrators, and the extent to which this law is clearly established. We must also determine whether the facts alleged and shown by Ammons, some of which are in dispute, support a constitutional violation. Accordingly, we have jurisdiction to hear this appeal, and we evaluate Appellants’ claims of qualified immunity by resolving all factual disputes in Ammons’s favor. See id.
III.
We review de novo a district court’s denial of qualified immunity by summary judgment. Davis v. City of Las Vegas, 478 F.3d 1048, 1053 (9th Cir.2007) (citing Bingham v. City of Manhattan Beach, 341 F.3d 939, 945 (9th Cir.2003)). In reviewing the denial of qualified immunity, we consider the “purely legal issue of whether facts alleged by the plaintiff support a claim of violation of clearly established law” such that appellants are not immune from suit. Lytle v. Wondrash, 182 F.3d 1083, 1086 (9th Cir.1999) (internal citation and quotation marks omitted).
Qualified immunity shields state officers from civil liability for damages unless (1) the facts alleged by the plaintiff establish a violation of the plaintiffs constitutional rights; and (2) the constitutional right in question was “clearly established” when the defendant committed his alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009). Put another way, “[t]he principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law.” Id. at 823. Courts are given the discretion to decide “which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.” Id. at 818.
Here, it is difficult to assess whether the facts alleged by Ammons establish the alleged constitutional violation without setting forth the governing law. Therefore, we first examine the clearly established law with respect to the alleged Fourteenth Amendment violation, and then determine whether the facts before us support such a violation.
IV.
For a constitutional right to be “clearly established,” “[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, “in light of pre-existing law the unlawfulness must be apparent.” Id.
A. The Constitutional Right
Although Ammons asserts in her complaint that Appellants violated her consti *1027 tutional right to “equal protection, as well as [her] constitutionally protected right to procedural and due process of law,” the alleged facts and her contention that La-Fond and Webster were “deliberately indifferent” to her safety make clear that her § 1983 claim is based on her Fourteenth Amendment substantive due process right to safe conditions while involuntarily committed to the custody of a state actor.
Involuntarily committed patients in state mental health hospitals have a Fourteenth Amendment due process right to be provided safe conditions by the hospital administrators. In Youngberg v. Romeo, 457 U.S. 307, 310, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court was confronted with an involuntarily committed mental patient in a state hospital who alleged that, while at the hospital, he had been injured on numerous occasions “by his own violence and by the reactions of other residents to him.” The patient, Romeo, sued three hospital administrators for failing to institute appropriate procedures to prevent the injuries they “knew, or should have known” Romeo was receiving, thereby violating Romeo’s rights under the Fourteenth Amendment. Id. Noting that “the right to personal security constitutes an ‘historic liberty interest’ protected substantively by the Due Process Clause,” the Court held that “[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confíne the involuntarily committed- — who may not be punished at all-in unsafe conditions.” Id. at 315-16, 102 S.Ct. 2452 (citations omitted).
According to Youngberg, the Constitution requires that hospital officials, in order to protect a patient’s right to safe conditions, exercise professional judgment. Id. at 321-22, 102 S.Ct. 2452. The Court explained that liability may be imposed for failure to provide safe conditions “when the decision made by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.” Id. at 323, 102 S.Ct. 2452.[4] Youngberg, then, created a standard whereby whether a hospital administrator has violated a patient’s constitutional rights is determined by whether the administrator’s conduct diverges from that of a reasonable professional. We refer to this as the “Youngberg professional judgment standard.” In distinguishing this standard from the “deliberate indifference” standard used -in Eighth Amendment cruel and unusual punishment cases, the Youngberg Court noted that “[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.” Id. at 321-22, 102 S.Ct. 2452 (emphasis added). The Court approvingly cited the Youngberg professional judgment standard in County of Sacramento v. Lewis, 523 U.S. 833, 852 n. 12, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), noting that “[t]he combination of a patient’s involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient’s welfare.” [5]
*1028 Relying upon Youngberg, the Ninth Circuit has repeatedly recognized the Fourteenth Amendment right of involuntarily committed patients to safe confinement conditions. See Neely v. Feinstein, 50 F.3d 1502, 1507 (9th Cir.1995) (“A mental patient’s right to personal security in the institution to which he or she is committed was clearly established in 1988 [the year of the alleged violation].”); Flores by Galvez-Maldonado v. Meese, 942 F.2d 1352, 1363 (9th Cir.1991) (describing Youngberg’s holding as “when individual is in state custody, state may acquire constitutional duty to ensure individual’s safe care”); Estate of Conners by Meredith v. O’Connor, 846 F.2d 1205, 1207 (9th Cir.1988) (holding that, under Youngberg, patients who have been involuntarily committed to a state mental hospital retain liberty interests in safety). Therefore, at the time the events alleged in this case took place, it was clearly established that LaFond and Webster, as state officials, had a duty to exercise professional judgment to provide safe conditions for Ammons and the other patients at CSTC.
B. Violation of the Constitutional Right
In light of the clearly established law that hospital officials must provide safe conditions for involuntarily committed patients, we now examine the circumstances under which state hospital officials may be held responsible for failing to do so.
We previously applied the Youngberg professional judgment standard in Neely, 50 F.3d at 1507, a case with facts remarkably similar to those presented here. There, a female patient (Neely), who had been allegedly molested by a hospital staff member (Terry), sued state mental hospital administrators and staff. Neely named as defendants Feinstein, the hospital superintendent; Hosley, the Director of Nursing; Murgo, the chairperson of the committee assigned to investigate prior accusations against Terry; and Brown, the building supervisor. Id. at 1506-07. Prior to Neely’s allegations, two other patients had also alleged that Terry had sexually assaulted them. Id. at 1505. In response to both prior incidents, Feinstein convened a committee to investigate the allegations and, both times, the committee determined *1029 “there was no evidence to substantiate the allegations against Terry.” Id. at 1506. After the second investigation concluded, however, Feinstein issued a reprimand to Terry for showing “very poor judgment” in placing himself in situations where he was alone with female patients. Id. Hosley issued an oral directive barring Terry’s assignment to work in the women’s ward and “in one-to-one seclusion” with female patients. Hosley later lifted this restriction, and Brown assigned Terry to work in one-on-one seclusion with Neely. It was then that Terry’s alleged assault of Neely occurred. Id. at 1506.
In our analysis, we first acknowledged that the Youngberg professional judgment standard served as clearly established law at the time of the alleged abuse. Id. at 1507. We recognized that, in O’Connor, 846 F.2d at 1208, another case involving a patient grievously harmed in a state-run mental hospital, we applied the objective Youngberg standard and equated it “ ‘to that required in ordinary tort cases for a finding of conscious indifference amounting to gross negligence.’ ” Neely, 50 F.3d at 1507 (quoting O’Connor, 846 F.2d at 1208) (emphasis added).[6]
We further explained that this “conscious indifference” standard is not the same as the “deliberate indifference” standard used in the Eighth Amendment cruel and unusual punishment context and extended to alleged violations of pre-trial detainees’ rights under the Fourteenth Amendment. Id. We therefore rejected the argument that the applicable standard of “conscious indifference” required the plaintiff to show that the officials were “subjectively aware of the risk” posed to the patient, noting that although a “subjective awareness requirement comported with the Eighth Amendment’s proscription against cruel and unusual punishment,” there is no such requirement to enforce patient rights arising from the Fourteenth Amendment. Id. at 1508.[7] Accordingly, we recognized that the Youngberg professional judgment standard is “necessarily an objective test.” Id. (emphasis added).[8]
*1030 We concluded that, at the time of the hospital officials’ actions, the law in this circuit clearly established that “(1) patients have a constitutional right to be safe in the state institution to which they are committed, and that (2) in the face of known threats to patient safety, state officials may not act (or fail to act) with conscious indifference, but must take adequate steps in accordance with professional standards to prevent harm from occurring.”[9] Id.
Pursuant to this framework, we affirmed the district court’s denial of qualified immunity for Feinstein on the ground that he summarily disregarded the risk that Terry, a hospital employee previously accused of sexual molestation, would sexually abuse female patients. The evidence supported a finding that Feinstein failed to exhibit “vigilance in protecting the safety of female patients, and that a reasonable hospital official would have done much more to eliminate the risk that Terry would sexually abuse female patients under the hospital’s care.” Id. at 1509.
Murgo, the chairperson of the committee convened to investigate the prior allegations against Terry, was found qualifiedly immune. Id. at 1511. We reasoned that, although the committee did not interview certain witnesses, it did interview those witnesses required by hospital regulations. Id.
Hosley, who informed the shift supervisors that Terry should not be assigned to the women’s ward or to one-on-one seclusion with female patients, was found qualifiedly immune. Id. Although Hosley did not put this directive in writing, she did not act unreasonably because Feinstein, her supervisor, did not instruct her to do so. Id. Additionally, there was no evidence that Hosley was informed of the evidence of Terry’s prior sexual assaults, which Feinstein had reviewed. Id. Hosley’s lack of awareness of the prior accusations against Terry was relevant to our assessment of the reasonableness of her actions, although it was not the basis for finding her qualifiedly immune.
Brown, the building supervisor assigned to the women’s ward, was found qualifiedly immune because he had assigned Terry to the women’s ward only after the restriction was lifted and in light of a staff shortage. Id. We held that Brown could not have been said to have acted unreasonably. Id.
In sum, we held the lower-level supervisors qualifiedly immune due to their compliance with hospital regulations and supervisory guidance and directives (to the extent such directives were issued), and because their conduct was reasonable in light of practical considerations. Feinstein was found subject to liability because, as head of the hospital, he failed to act to protect the safety of patients through effectively guiding lower-level supervisors to reduce the safety risk posed by Terry. Contrary to the dissent’s assertions, there is nothing contradictory about this resolution.
Youngberg and Neely serve as pre-existing, clearly established law as to what *1031 conduct supports infringement of the Fourteenth Amendment rights of involuntarily committed hospital patients. At the time of the alleged events, then, it was clear that the actions of LaFond and Webster violated the Constitution if they ran afoul of the objective Youngberg professional judgment[10] standard as applied in Neely.[11]
V.
We now determine whether the facts of this case, as construed in a light most favorable to Ammons, could be found to amount to a violation by LaFond or Webster of Ammons’s constitutional rights. In other words, we must determine whether the facts alleged, if proved, are sufficient to support a jury finding that the official’s conduct was “such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.” Youngberg, 457 U.S. at 323, 102 S.Ct. 2452. We review the allegations with respect to LaFond and Webster separately.
A. LaFond
Here, the primary evidence that supports LaFond’s liability is (1) that she knew that Grant had been previously investigated for sexual abuse of a female patient yet she allowed Grant to continue working in a cottage housing female patients without taking steps to ensure that he was not given repeated opportunities to be alone with one or more of these patients; and (2) that she took no action in spite of increasing and documented evidence of the inappropriate relationship between Ammons and Grant.
First, as to the prior accusation made against Grant, the record reflects that Resident A repeatedly stated that Grant had touched her inappropriately, but later recanted her allegations when speaking to Dr. Bacon. At no point, however, did Resident A recant her testimony to outside investigators. That she recanted to Dr. Bacon in a moment when she was admittedly upset about losing contact with Grant, at the very least, raises doubts as to CPS’s conclusion that the accusations were “unfounded.” Despite these facts, of which LaFond was aware, LaFond permit *1032 ted Grant to continue working unsupervised with the female patients in their residential cottages, at times in one-on-one situations.[12] LaFond declared that it was her general practice, when an accusation of staff abuse was determined unfounded, to instruct the supervisors to watch the staff member more closely and to counsel him or her about any high risk behavior. In neither her declarations nor her deposition testimony, however, does LaFond state that, after Resident A’s accusation, La-Fond instructed Grant’s supervisors to watch him more closely or provided Grant with counseling about any high risk behavior.
Second, the facility that LaFond was charged with overseeing contained overwhelming information and signals that Grant was pursuing improper relationships with female patients and with Ammons specifically. Ammons flirted with Grant so regularly and extensively that CSTC staff frequently commented on it, both in her files and to Ammons herself. In fact, Ammons’s file contained 188 references to her improper interactions with male staff, as well as documentation about her feelings toward Grant in particular. Ammons and Ramsey exchanged love letters with Grant, made posters for Grant, and received pictures of Grant, which they “plastered” on “entire sections on the walls of [their] rooms” where they were highly visible to any staff member. Notably, Ammons’s foster mother repeatedly voiced her concerns about the relationship between Ammons and Grant to CSTC, and specifically asked that Grant not be permitted to be alone with Ammons. Ammons points out that CSTC is a small community, and that LaFond had every opportunity to become aware of the escalating impropriety between Grant and Ammons, and to take action accordingly. LaFond apparently failed to take affirmative steps to inform herself of the situation at CSTC, even after Rutherford had explicitly warned her about the staffs failure to respond appropriately to reports of sexual impropriety.
We hold that, under these facts, a fact-finder could determine LaFond’s actions demonstrate a substantial departure from reasonable professional judgment. La-Fond was aware that Grant was previously accused of sexually molesting a minor female patient. The investigation concluded that the accusations were unfounded only because the accuser unreliably recanted. Under Neely, a jury could find that a reasonable administrator, exercising professional judgment with respect to providing safe conditions, would have taken Resident A’s allegation into account when assigning and supervising staff members in cottages where female patients resided. While LaFond had no cause to discipline Grant, because he had been exonerated of the molestation charge, she certainly had reason, in light of her duties with respect to the safety of her patients, to manage and monitor his duties more carefully. Instead, LaFond allowed Grant to gain unfettered and unmonitored access to the female residents, and to spend time with them on a one-on-one basis.[13]
*1033 Even more compellingly, LaFond and the rest of the CSTC staff were practically inundated with signs and indications that Ammons and Grant were engaged in an inappropriate relationship. Ammons’s lack of boundaries with male staff, and her preoccupation with Grant in particular, were well documented in her files. Her particular relationship with Grant was evidenced by her behavior and the display on the wall of her room, so much so that her crush was apparent to other patients and staff members. LaFond had every reason to monitor the relationship between Grant and Ammons in light of Rutherford’s warnings and Tienhaara’s repeatedly voiced concerns.
Regardless of whether LaFond was subjectively aware of these signals, a jury could conclude that a reasonable hospital administrator in LaFond’s position of authority, knowing of the previous accusations against Grant and of Rutherford’s warning, would have taken steps to become aware of what was happening through a basic review of Ammons’s file or by simply walking through the facility. A jury could additionally find that a reasonable hospital administrator, exercising professional judgment, would have taken steps to ensure that the staff who worked closely with Grant appreciated the seriousness of the situation and brought these signs to the administrator’s attention so that she could take the necessary steps to prevent Grant from abusing his position. LaFond should have at least taken steps to ensure that she was informed of specific concerns voiced by parents such as Tienhaara so that she could look into the matter further.[14]
LaFond “bears the responsibility for taking adequate steps to ensure that [her] subordinates” maintain the safety of the patients pursuant to her orders and instructions because, as the head of CSTC, LaFond “is the one who is ultimately accountable for the safety of the patients.” Neely, 50 F.3d at 1510. Instead of taking steps to ensure that her subordinates adequately monitored the relationships between staff and patients, LaFond took lit *1034 erally no action whatsoever to prevent Grant from engaging in an abusive relationship with Ammons. Whether because of ignorance or a failure to fully appreciate the seriousness of the situation, LaFond allowed this relationship to go on for months, unchecked and unmonitored, and it was not until Ammons returned to her foster family and continued to have contact with Grant that any action was taken. We hold that, under the facts alleged and produced, LaFond’s apparent inaction and poor supervision with respect to the safety of Ammons and the other female patients support a finding that she failed to exercise professional judgment,[15] and thereby violated the Fourteenth Amendment.[16]
Indeed, we note the similarity between the evidence here and that in Neely. Like superintendent Feinstein in Neely, La-Fond was aware that allegations of sexual abuse had been brought against one of the hospital staff. And as in Neely, these allegations triggered an investigation of the staff member that determined that the *1035 allegations were not credible. In both cases, the harm to the plaintiff resulted from the hospital administrator’s failure to take meaningful steps to prevent the formerly accused staff member from interacting one-on-one with female patients. In Neely, we found these facts sufficient to support a reasonable jury’s determination that Feinstein failed to exercise professional judgment. The record in this case presents even more evidence of such a failure on the part of LaFond, as it additionally supports a claim that LaFond remained unreasonably ignorant of or ignored the overwhelming evidence that Grant continued to flagrantly abuse his position.[17] Whereas Feinstein reprimanded Terry for poor judgment and Hosley placed restrictions on Terry’s duties, La-Fond made no changes with respect to managing Grant.
As a final matter, we note that Young-berg articulated the professional judgment standard as the proper instruction for the jury; our opinion merely recognizes that the ultimate decision in this case should likewise go to a jury. Our holding does not impose liability upon LaFond; nor does it, as the dissent suggests, conclusively prescribe any particular administrative conduct.[18] We hold only that, supposing Ammons’s allegations are true, a reasonable jury could conclude that LaFond, like Feinstein, demonstrated “a substantial departure from accepted professional judgment” that amounts to a violation of Ammons’s clearly established Fourteenth Amendment right to safety during her involuntary commitment to a state hospital. We must conclude, therefore, that LaFond is not entitled to qualified immunity.
B. Webster
We next consider whether the facts alleged against Webster support a Fourteenth Amendment claim against him. The pertinent facts alleged against Webster are the following. Webster, as Director of Nursing from January to April 2003, was “closer” to Ammons while Grant was molesting her than was LaFond. As CEO at CSTC during the last three weeks of Ammons’s residence, Webster had access to information about Ammons, including her intake assessment indicating that she was particularly vulnerable to sexual *1036 abuse. Importantly, Ammons neither alleges nor introduces any evidence that, during Ammons’s time at CSTC, Webster knew of the allegations by Resident A or the subsequent investigation of Grant.[19]
We cannot conclude, even taking all of Ammons’s allegations as true, that a jury could find that Webster demonstrated a substantial departure from reasonable professional judgment. He spent approximately eighteen days as CEO of CSTC during Ammons’s stay, which would not have provided him with reasonable and sufficient time to become apprised of, and take meaningful action with respect to, the situation between Grant and Ammons. Moreover, during his time as Director of Nursing, there is no indication that he was aware of the previous allegations against Grant such that a reasonable professional in his position would have a reason to closely or personally monitor Grant’s behavior or to alert his superiors as to any impropriety. As with Hosley, the Director of Nursing in Neely, the “absence of a sufficiently strong directive from [LaFond] served to understate, to all staff members, the risk that [Grant] posed to female patients.” 50 F.3d at 1511. The record contains no indication that Webster disregarded, remained unreasonably ignorant of, or failed to exercise reasonable professional judgment with respect to Ammons’s safety. Therefore, because the alleged facts are insufficient to maintain a constitutional claim against him, Webster is entitled to qualified immunity.
VI.
Ammons has alleged the violation of her clearly established constitutional right to safe conditions during her involuntary commitment to a state hospital. The contours of this right have been clearly established by the objective test set forth in Youngberg and applied to similar facts in Neely. Taking all the facts in a light most favorable to Ammons, we hold that the allegations and evidence against LaFond sufficiently support a constitutional violation that defeats qualified immunity, while those against Webster do not. The district court’s denial of summary judgment as to LaFond is AFFIRMED. The district court’s denial of summary judgment as to Webster is REVERSED. The case is REMANDED for further proceedings consistent with this opinion.
AFFIRMED IN PART AND REVERSED IN PART.

. Webster left in February of 1990 and returned in January 2003. He was not employed at CSTC in 2000 or 2001.

. By the time Ammons aged out of the system at age eighteen, she had resided in fifteen different foster homes, residential facilities, and psychiatric hospitals.

. Grant was criminally charged with three counts of rape of a child in the third degree and one count of child molestation in the third degree. On February 22, 2005, Grant entered an Alford/Newton plea to the charge of communication with a minor for immoral purposes in violation of Washington law.

. Although the issue was not directly before it, the Court also held that the district court should have admitted expert testimony that was excluded because such testimony may have been “relevant to whether [the administrators'] decisions were a substantial departure from the requisite professional judgment.” Id.

. The dissent's formulation of the Youngberg professional judgment standard is misleading. According to our dissenting colleague, we *1028 should examine only whether LaFond exercised any professional judgment at all, because, under Youngberg, "exercising any professional judgment will shield a state hospital professional from § 1983 liability.” The Youngberg standard, however, is not so permissive. In requiring that "professional judgment” be exercised, the Court made clear that the judgment of professionals must not depart substantially from "accepted professional judgment, practice, or standards,” 457 U.S. at 323, 102 S.Ct. 2452, with respect to protecting a patient's right to safely, id. at 322, 102 S.Ct. 2452. Just "any” judgment, therefore, will not do; the official must exercise judgment that comports with an objective standard. Id. at 322-23, 102 S.Ct. 2452 (noting that the courts must make certain that "professional judgment in fact was exercised").
Moreover, the dissent misconstrues the nature of the presumption articulated in Youngberg. While Youngberg does state that decisions made by a public official are presumptively valid as an initial matter, the case also makes clear that the method by which that presumption- is overcome is the application of the Youngberg professional judgment standard itself, that is, by assessing whether the actions of the professional meet this objective standard. Id. at 323, 102 S.Ct. 2452. In other words, the Youngberg professional judgment standard does not contain any presumption in favor of government officials; instead, the standard is the mechanism by which we assess whether the presumption has been overcome. Our task, therefore, is to apply the Youngberg professional standard to determine whether the presumptive validity of LaFond's and Webster’s conduct has been rebutted. This is precisely what we do in this opinion.

. As the dissent points out, in L.W. v. Grubbs, 92 F.3d 894, 897 (9th Cir. 1996), we disapproved of the use of a “gross negligence” standard in a prison nurse's § 1983 action against her supervisors for violation of her substantive due process rights after an inmate allegedly attacked her. We noted that Neely's use of the term "gross negligence” was not necessary to the decision, and should be limited to the claims of "captive” plaintiffs "injured because of a miscarriage of the ‘professional judgment of a [government] hospital official.’ ” Id.

. Indeed, Neely further notes that even our Fourteenth Amendment jurisprudence that applies the "deliberate indifference standard,” rather than the "conscious indifference” standard applicable here, has never "required officials to have subjective awareness of the risk of harm in order to be deemed ‘deliberately indifferent.' " Id. (citation omitted).

. LaFond and Webster cite one of our recent decisions, Tamas v. Department of Social & Health Services et al., 630 F.3d 833 (9th Cir. 2010), for the proposition that deliberate indifference requires a plaintiff to show that the official was subjectively aware of facts from which an inference of substantial risk could be drawn. Tamas, however, interprets the "deliberate indifference” standard in the specific context of the state’s obligation toward foster children, consistent with the holdings in other circuits. Id. at 844-45. Tamas makes no reference to Youngberg, Neely, or any case addressing the standard applicable to public hospital officials' duty to ensure the safety of their patients. Indeed, it is logical that the standard governing the state’s duties with respect to foster children would differ from that governing the state's actions vis-avis hospital patients, as the degree of control and day-to-day responsibility that the government exerts over the latter is considerably higher. Therefore, Neely remains the controlling law of this circuit for purposes of this case, and Tamas is inapposite.

. This reference to "known threats” does not negate Neely's clear instruction that subjective awareness of risk is not required in the context of this Fourteenth Amendment right. Hospital officials’ knowledge of particular threats to patient safety is certainly relevant to the reasonable professional judgment standard against which their actions are assessed, that is, to the determination of whether the officials have acted with conscious indifference. Such knowledge, however, is not required to demonstrate a violation. Accordingly, Neely merely acknowledges that Feinstein was aware or should have been aware of the risk posed by Terry, which speaks to the actions necessary for him to discharge his duty to act in accordance with professional standards.

. Thus, the dissent’s insistence that courts "have no business prescribing managerial behavior for mental institutions” is more properly directed at the decision in Youngberg than to our denial of qualified immunity. The Supreme Court has made it our business to assess whether a public hospital administrator’s alleged failure to provide safe conditions gives rise to a constitutional violation under the Youngberg professional judgment standard. It also made it the business of juries to decide whether the standard has been violated.

. The dissent goes to great lengths to unnecessarily obscure Neely’s analysis and to discredit it as clearly established law. As we have discussed in this opinion, Neely’s reconciliation of the myriad of legal standards applied in the context of the Fourteenth Amendment is, to be sure, complex, but it nonetheless remains consistent with our precedent.
And regardless of this complexity, Neely makes crystal clear its conclusion that Feinstein’s failure to act to ensure Neely’s safety, and his specific failure to take into account the previous accusations against Terry, support a violation of the Youngberg standard. This conclusion, at least, serves as clearly established law. Thus, the opinion's conclusion with respect to facts remarkably similar to those here, if not its legal analysis, is undoubtedly sufficient to put LaFond on notice as to the contours of her constitutional duty with respect to patient safety. See Anderson, 483 U.S. at 640, 107 S.Ct. 3034.
Unlike our dissenting colleague, we do not feel free to simply disregard Neely based on our own views of the strength of its reasoning. We are bound by this precedent and will faithfully apply it.

. We note that LaFond's awareness of the prior accusations of sexual abuse against Grant speaks to the assessment of whether LaFond acted in accordance with objective professional standards, that is, to what a reasonable official would do to ensure the safety of the patients at CSTC. In noting this awareness, we do not imply that subjective awareness of the particular risk is required to demonstrate a violation. See Part IV.B, supra.

. We fully acknowledge that Grant was ex-
onerated as an official matter. This certainly does not mean, however, that, as a practical matter, his one-on-one seclusion with minor female patients did not in any way pose a risk to their safety. Indeed, Grant’s subsequent sexual molestation of Ammons, like Terry’s molestation of Neely, only confirms this. We accordingly recognize that a jury could conclude that a reasonable hospital administrator, in performing his or her constitutional *1033 duty with regard to patient safety, would have done more to protect vulnerable female patients.
Contrary to the dissent’s argument, we do not hold that the Due Process Clause requires hospital administrators to take any action that the law otherwise forbids. We do not even suggest that the administrator must disclose previous accusations of sexual misconduct to any other party, include the accused’s name on any public database, or impose any adverse consequence as a result of the accusation. Thus, the dissent’s discussion of various Washington statutes and our holding in Humphries v. County of Los Angeles, 554 F.3d 1170 (9th Cir.2009), rev’d in part on other grounds, — U.S. -, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010), is irrelevant. The dissent also invokes, puzzlingly, Burlington Northern v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), a Title VII retaliation case. We do not see how the standard for retaliatory adverse employment actions in the Title VII context is relevant here. Id. at 66, 126 S.Ct. 2405 (noting that “Title VII primarily seeks to protect ... victims of race-based, ethnic-based, religion-based, or gender-based discrimination’’).

. The dissent makes much of the distinction between action and inaction, arguing that there exists an "infinite list of LaFond’s inactions toward Ammons.” To clarify, because Youngberg makes clear that involuntarily committed patients have an affirmative right to reasonable conditions of safety, a state official's inaction, to the extent that it speaks to his or her failure to provide such conditions, is precisely what we must evaluate in applying this standard. See Youngberg, 457 U.S. at 320, 102 S.Ct. 2452 (“The question then is ... whether the ... lack of absolute safety is such as to violate due process.” (emphasis added)).
Because, as the dissent agrees, the record contains no evidence that LaFond took steps to stay informed of any sexual impropriety between staff and patients, we construe this deficiency in Ammons's favor.

. The dissent faults us for reaching this conclusion without reciting precisely the "accepted professional judgment, practice, or standards” for the administration of residential health facilities for youths. If there existed such a "golden code” of professional conduct against which to measure LaFond’s actions, there would be no need for a jury at all, as we judges could conclusively determine whether LaFond is liable. We accept, as the dissent repeatedly recognizes, that a conclusive application of the Youngberg standard will indeed require additional facts, expert testimony, and a host of other evidence in order to definitively determine what a reasonable professional would have done, that is, the standard against which to conclusively measure LaFond’s actions. Youngberg, 457 U.S. at 323 n. 31, 102 S.Ct. 2452 (noting that expert testimony is relevant to whether a public employee failed to exercise the requisite professional judgment). This is precisely the role that a jury plays.
This is also why an award of summary judgment is unwarranted at this early stage. Ironically, the dissent, like us, cannot articulate the code of professional conduct for administrators of residential health facilities, and yet the dissent somehow conclusively determines that, as a matter of law, LaFond did not depart from any such code. In doing so, the dissent fails to make all inferences and construe all facts in Ammons's favor, as we must.
Finally, the dissent ignores the testimony of multiple experts in the record before us stating that LaFond’s performance fell well below the standard of care required by law, policies, procedures, and practice. One expert reports her professional opinion that the investigation of Resident A’s accusation, and its resolution within the facility, were grossly inadequate. The expert points out that no monitoring or safeguards were put in place, and Grant was allowed to be alone with female patients for whom he was not responsible. This expert further notes a number of actions, taken after Ammons’s molestation came to light, that should have been taken after Resident A's accusations. She finds the degree of inaction at the facility "astounding” and "hard to fathom” in a professional situation, and she concludes that LaFond was "grossly and extremely negligent.” We do not agree with the dissent that this testimony "should be afforded minimal weight.” See Nolan v. Heald College, 551 F.3d 1148, 1154 (9th Cir.2009) (it is improper to weigh evidence on summary judgment).

. In so holding, we hold LaFond accountable with respect to her own failure to manage and supervise her employees. We do not, as the dissent suggests, create § 1983 liability on the basis of respondeat superior. It is well established that a supervisor may be held liable for a constitutional rights violation based on his or her own neglect in failing to properly superintend his or her subordinate’s duties. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009). In Youngberg itself, the Court held that a failure to institute appropriate procedures could give rise to liability under the Fourteenth Amendment. 457 U.S. at 322-23, 102 S.Ct. 2452. See also Simmons v. Navajo Co., 609 F.3d 1011, 1020 (9th Cir.2010) ("To survive summary judgment, the [plaintiffs] must therefore adduce evidence that [the supervisors] themselves acted or failed to act unconstitutionally, not that some subordinate did.” (emphasis added)).

. The dissent chastises us for pointing out this additional factual support for Ammons's claim, arguing that no case, not even Neely, supports our reasoning. We note in response that, under Neely, LaFond’s failure to consider the previous accusations against Grant alone supports our conclusion that qualified immunity is unwarranted. Nonetheless, we do not blindly ignore the additional facts suggesting deficiencies in LaFond’s performance. To pretend that these facts have no bearing on the relevant inquiry — whether a jury could decide in Ammons’s favor — would render us, as the dissent puts it, “unreflective and naive.”

. The dissent accuses us of being ''unreflective and naive” in this assessment. While we do not dispute that public officials may, in order to avoid trials, tailor their behavior to our qualified immunity decisions, we will not use this as the basis to transform Ammons’s burden in defeating qualified immunity into her burden in proving her case. The dissent's accusation, and indeed its entire position, is premised on a fundamentally incorrect notion that denial of qualified immunily is equivalent to a conclusive determination that the Constitution has been violated. Under such incorrect logic, we dare not deny qualified immunity unless we are certain that constitutional liability will be proved.
Our denial of qualified immunity, as that in Neely, however, makes no prediction as to whether a jury will find in the plaintiff's favor. Our decision simply recognizes that whether LaFond should be absolved of any wrongdoing is for a jury to decide. Put another way, we hold no more than that judgment in Ammons’s favor is not legally foreclosed. Whether public officials choose to interpret this opinion as something more than this is entirely up to them.

. We reiterate that Webster’s lack of knowledge, while not determinative, is relevant to the application of the Youngberg professional judgment standard.