KLEINFELD, Senior Circuit Judge,
dissenting:
I respectfully dissent. The California Supreme Court decision at issue could reasonably be made by fairminded jurists, so recent Supreme Court decisions require federal courts to deny the writ.
We are agreed that the record upon which the writ may or may not be granted is the record that was before the highest court of the state to have ruled on the issue, not the additional materials before the federal district court. The district court did not have the benefit of Cullen v. Pinholster[1] or Harrington v. Richter[2] when it granted the writ. Richter holds that a one sentence denial of the writ by the highest state court must be treated as an adjudication on the merits. Even when the “postcard denial” states no reasons, a federal court applying § 2254 “must determine what arguments or theories supported or, as here, could have supported” it, and then “must ask whether it. is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holdings in a prior decision of this Court.”[3] Federal habeas relief under § 2254 “goes no farther,” Richter holds, than that it “preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court’s decision conflicts with this Court’s precedents.”[4]
Richter’s sharp rebuke to our previous practice means that the writ must be de *1167 nied. The majority suggests that because the California Supreme Court did not provide a reasoned opinion, we ought to test the California Court of Appeal’s reasoning instead. Oddly, the majority thinks we should test the reasonableness of the Court of Appeal decision against evidence not presented until the ease subsequently went to the California Supreme Court.
We do have Ninth Circuit decisions that say we “look through” summary orders of a state’s highest court to the last reasoned opinion.[5] I question whether those cases are still good law, after Richter. Even if they are, the majority does not cite a single case where we reject the intermediate appellate court’s reasoning based upon evidence presented not to it, but subsequently to the state supreme court. The origin of the “look through” is Ylst v. Nunnemaker.[6] That pre-AEDPA case does not support what the majority does here. Ylst instructs courts to “look through the subsequent unexplained denials to that [last reasoned] opinion, unless respondent has carried his burden of adducing strong evidence that one of the subsequent courts reached the merits of the federal claim.”[7] Richter establishes that the California Supreme Court’s decisions in this ease were decisions on the merits, so there is no longer any need to “look through” to the lower court decision.[8]
The majority interprets Richter by omitting the phrase “or, as here, could have supported.” Richter holds, not that we should evaluate reasonableness based upon “the reasons expressed,” as the majority says, or merely “what arguments or theories supported” the California decision, but also what arguments “as here, could have supported the state court’s decision.”[9] Now that we know from Richter that we should be reviewing the California Supreme Court’s postcard denial as a decision on the merits,[10] and that we must leave it alone if there is any possibility that fairminded jurists could disagree with whatever arguments or theories “could have” supported it,[11] we have no justification for granting a writ because we reject as unreasonable arguments or theories articulated by a lower court.
Cullen v. Pinholster[12] holds that the proper scope of the record for federal habeas is what was before the state court, not what came subsequently into federal court. “It would be strange to ask federal courts to analyze whether a state court’s adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.” [13] This explanation by the Supreme Court is analogous to the majority’s testing the California Court of Appeal decision against facts not before it. A federal habeas petitioner “must overcome the limitation of § 2254(d)(1) on the record that was before that state court.”[14] We are required to treat the *1168 California Supreme Court denial of the writ against the facts presented to the California Supreme Court.
Cannedy’s evidence is a claim that J.C., a then-friend of the victim, and J.C.’s mother saw a message on the internet in which the victim said she had lied about Cannedy’s sexual molestation because she wanted to move from her mother’s and step-father’s home to her father’s home. I assume for purposes of discussion that this evidence would have been very helpful to the defense’s attack on the victim’s credibility, and that had the friend and her mother been called by the defense as witnesses, they would have testified to seeing the message.
The question before us is limited to whether Cannedy’s trial lawyer rendered ineffective assistance of counsel by failing to interview the friend and put her on the stand. Pretty plainly, had he known about this evidence, and not known of some good reason not to use it, his conduct would have been hard to justify. The critical question is whether he knew or, at the minimal level of competence required by Strickland,[15] ought to have known, of this evidence.
A criminal defense lawyer would ordinarily not know the identities of a purported victim’s friends or former friends, and would not know what the purported victim had posted on the internet. No one has claimed that the supposed posting is still available on the internet, and no screen print has ever been submitted anywhere. No one has suggested that all Cannedy’s lawyer had to do was Google the victim and check her postings on some specified online bulletin board to see it. Knowledge evidently depended on discovering, locating, and interviewing the victim’s then-friend J.C.
What we have to do, under Pinholster and Richter, is examine the record before the California Supreme Court, and determine whether any theory or argument could have created a difference of opinion among fairminded jurists on whether Cannedy’s trial lawyer rendered sub-Strickland assistance. And here is what we have. J.C. said the purported victim said in her posting she “just made it up,” and J.C.’s mother said that was true. Neither said they had told Cannedy or his lawyer about the posting. No matter how helpful their message was, Cannedy’s trial lawyer could not have used it if he did not know about it. The then-friend and her mother said that they knew the purported victim had recanted, but they never said that they told Cannedy’s lawyer or Cannedy about the recantation.
In the state court, Cannedy never said in so many words that he told his lawyer what J.C. and her mother had to say, or their names. The record shows that Cannedy has had at least eight lawyers over the life of this case. He fired his trial lawyer after his conviction, and fired his subsequent lawyer after his motion for new trial, and fired his subsequent lawyer after his state habeas proceedings, so he has had plenty of legal assistance to make his statement as good as the truth would allow. He gave the California Court of Appeal J.C.’s statement and declaration, and correspondence among some of his lawyers, but he did not give the Court of Appeal any statement from himself. He did not tell the Court of Appeal that he had told his lawyer who J.C. was and what she had to say. Perfectly reasonably, the California Court of Appeal did not assume that he had done what he did not claim to have done. It reasonably opined that there was “no allegation that trial counsel knew of the existence of J.C., the informa *1169 tion on the internet, or the time frame given for the alleged internet information, and there is no documentary evidence.” The majority performs the contortion of looking through the California Supreme Court decision to the prior California Court of Appeal decision, and deems it unreasonable based on what Cannedy never submitted to the Court of Appeal.
After losing in the Court of Appeal, once that court had told him what was wrong with his petition, Cannedy improved the record with an artfully shaped statement addressing the deficiency. Before the California Supreme Court, for the first time, he submitted a declaration that he gave his trial lawyer “names, addresses and phone numbers of all potential witnesses who could give favorable testimony in my behalf.” In a subsequent paragraph he claims that he specifically told his trial lawyer “about” J.C. and “indicated that she could give favorable testimony in my behalf as to a motive” for the purported victim to make a false accusation.
Cannedy’s declaration makes it sound as though he told his trial lawyer J.C.’s name, address, phone number, and that she would testify that the victim had recanted. But he does not quite say so. He could probably avoid a perjury prosecution if it were proved that he had never told his lawyer J.C.’s name and address, or just what she supposedly said she saw on the internet. After all, the “name, address and phone number” part of the declaration was in a different paragraph, and all he claimed to have told his lawyer regarding J.C. was “about” her and that she could testify about “motive.” Strikingly, even though his failure to declare that he told his lawyer J.C.’s name and what she would say was the basis for the Court of Appeal decision, he avoids saying in so many words that he did so.
Cannedy’s trial lawyer of course was not a party to his state or federal habeas proceedings, so he lacked standing to file motions or submit evidence, and likely did not even know just what was happening in the case. We can glean something of what he said, though, from Cannedy’s own submission of Cannedy’s chosen communications involving his trial lawyer.
During the state habeas proceedings, long after the trial, when Cannedy’s trial lawyer had long since given the file to his replacement, a subsequent lawyer wrote him asking whether he had talked to J.C., and summarizing the supposed testimony J.C. could have provided. Trial counsel told habeas counsel that Cannedy’s previous lawyer had made frivolous claims against him about ineffective assistance and asked him to “take the fall” for Cannedy. He no longer had Cannedy’s file, since he had turned it over to his replacement, but he did go over with Cannedy all the witnesses and they agreed that there were no more helpful witnesses.
Fairminded jurists could have reasonably concluded from the evidence in the California record that Cannedy did not tell his trial lawyer what this case turns on, J.C.’s name, how to find her, and that she would testify that the purported victim had recanted. A lawyer cannot be deemed to have rendered ineffective assistance for failing to discover a witness who whose identity, location, or observations he does not know anything about. Lawyers are not omniscient. Because fairminded jurists could (and did) so conclude, the federal courts are not permitted, under Richter and Pinholster, to issue the writ.
This is not to say that fairminded jurists could not also reasonably conclude the opposite, that Cannedy told trial counsel and trial counsel failed to interview an important witness of whom he had been advised. The majority draws that inference, and it is not unreasonable. But neither is it inevitable. And it is the reasonableness of the *1170 California Supreme Court’s decision, not the majority’s, that controls.
So far, I have assumed for purposes of discussion that trial counsel’s failure to interview and call J.C. was prejudicial. That is not necessarily so. To establish prejudice from deficient assistance of counsel, Cannedy “must demonstrate a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceedings would have been different.” [16] Because a federal court can only grant a writ if the state court’s decision went beyond error to unreasonableness, the question for us is not whether we think there is a reasonable probability that J.C.’s statement would have led to a different outcome. It is whether the California Supreme Court, even though it did not say so,[17] would have to so conclude.
Cannedy has two problems on prejudice, even if we assume for purposes of discussion that he told his lawyer J.C.’s name and address or enough to find her, and what she would say. First, a jury might not believe her. And second, they might believe her but not believe the purported victim’s recantation. As for believing J.C. and her mother about what they saw on the internet, defense counsel’s problem would have been that they had no screen printout. The handwritten record J.C. said she wrote down might, to the jury, seem more likely to be a subsequent fabrication than an accurate record, since it is easy enough to print out what is on the screen, and J.C. claimed it was so obviously important that she called her mother in to look at it. Of course we have no idea whether there might have been other impeachment, such as a spat between two girls who used to be close friends.
A jury might also have believed J.C., but not believed the victim’s recantation. Sometimes true victims claim to have been lying when they made their accusations, to preserve a relationship that their true accusations would sever. Recantations are often viewed with skepticism by courts.[18] The jury might also have been skeptical. And the victim’s accusations were supported by her aunt’s testimony that Cannedy had molested her too when she was a teenager.
Jurors might have been skeptical about whether J.C. really read what she claimed on the internet, or whether the victim spoke the truth on the internet, or both. Thus a fairminded jurist could conclude that putting J.C. on the stand, even had counsel known of her existence, probably would not have made a difference. Certainly the defense case would have been a lot stronger had J.C. testified, assuming she appeared honest when she did. And defense counsel would have had a better argument to make about the victim’s credibility. But that is as far as we can go, and it is not far enough to surmount the deferential review we have to accord to the state court.
We should reverse the grant of the petition, because it was granted before Richter and Pinholster came down, and cannot withstand the force of those two decisions.

. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).

. Harrington v. Richter, - U.S. -, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).

. Id. at 786.

. Id.

. See, e.g., James v. Ryan, 679 F.3d 780, 801 (9th Cir.2012).

. Ylst v. Nunnemaker, 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

. Id. at 2596 (emphasis added).

. Richter, 131 S.Ct. at 784-85.

. Id. at 786.

. Id. at 784 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been ‘adjudicated’ on the merits.”).

. Id. at 786.

. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).

. Id. at 1399.

. Id. at 1400.

. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. Richter, 131 S.Ct. at 787 (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

. Richter, 131 S.Ct. at 784-85.

. See, e.g., Ammons v. Wash. Dept. of Soc. and Health Servs., 648 F.3d 1020, 1031 (9th Cir.2011).